AKRON BAR ASSOCIATION *v.* HOLDER.

[Cite as *Akron Bar Assn. v. Holder,*
102 Ohio St.3d 307, 2004-Ohio-2835.]

(No. 2003–1943—Submitted January 13, 2004—Decided June 16, 2004.)

**Per Curiam.**

{¶ 1} Respondent, William P. Holder of Akron, Ohio, Attorney Registration No. 0015110, was admitted to the practice of law in Ohio in 1966. On April 14, 2003, relator, Akron Bar Association, filed a second amended complaint charging that respondent had violated the Code of Professional Responsibility while representing several clients with competing interests. Respondent answered. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and considered the parties' comprehensive stipulations and other evidence. Based principally on the stipulated facts and exhibits, the board adopted the panel's findings of fact, conclusions of law, and recommendation.

{¶ 2} The professional misconduct charged in the complaint emanated from respondent's representation of a client involved in a business dispute, respondent's suit against that client for legal fees and fraud, respondent's efforts to assist his wife and a friend with opening a community school in East Cleveland, Ohio, and respondent's advocacy on his own behalf during the disciplinary

process. The parties' stipulations, incorporated exhibits, and witnesses substantiate, for the purpose of this case, the following facts.

## The Business Dispute

{¶ 3} Respondent met Marcus or "Mark" L. Wright, the client who would later file the grievance that initiated this disciplinary process, in 1999. By that time, Wright had been affiliated for a number of years with an Ohio nonprofit corporation established to provide social services to children enrolled in community or "charter" schools. This corporation, initially known as The Right Way Foundation, later became known as Child First Alternative Care ("Child First").

{¶ 4} The Right Way Foundation was incorporated in 1994, and a three-member board of trustees was appointed. An amendment to The Right Way Foundation's Articles of Incorporation, filed in 1997, purported to change the company's corporate name to Child First. That filing identified a business associate of Wright's as the chairman of the board. On the same filing, Wright was identified as Child First's president.

{¶ 5} By the fall of 2000, Wright and the associate were in sharp disagreement about Child First's operations, with the associate alleging Wright's misuse of corporate funds. The associate engaged legal counsel and threatened to sue Wright on behalf of Child First. In November or December 2000, Wright engaged respondent as his counsel in the dispute.

{¶ 6} On February 1, 2001, the associate filed suit against Wright in the Summit County Court of Common Pleas (the "Child First lawsuit"). Respondent appeared on Wright's behalf, representing him during proceedings that included a hearing before a court magistrate on February 9, 2001. During the hearing, the magistrate ordered that Wright's associate "continue to operate the business as the in-place chief executive officer." The magistrate further ordered that Wright "should not in any fashion undertake any business decisions on his own unilaterally that would affect the course of direction of the business or substantially be an expansion or regression of the business. In other words, he's to keep the status quo of the business."

{¶ 7} Respondent understood the magistrate's order to prohibit Wright only from affecting the business operations of Child First or altering its status quo. Respondent thus took steps that he considered permissible to defend his client against the associate's lawsuit.

{¶ 8} Respondent attempted to contact the three members of Child First's board of trustees, none of whom was the associate identified as the board chairman on the name-change filing. In May 2001, respondent and Wright were able to reach one trustee but not the other two. From discussions with this trustee and a deposition of the associate, respondent and Wright drew three

conclusions: (1) the Child First trustees had never elected the associate as an officer; (2) the Child First trustees had never authorized the 1997 corporate name change; and (3) the Child First trustees had not authorized the associate's suit against Wright.

{¶ 9} Respondent arranged a meeting of the Child First trustees to be held on May 25, 2001, at the Cincinnati office of the trustee with whom respondent and Wright had been in contact. Respondent sent notice of the meeting to the last known addresses of all three Child First trustees, but the other two trustees did not attend.

{¶ 10} Before the meeting, respondent prepared a series of corporate resolutions for execution, as well as an affidavit for the attending trustee to sign. One of the proposed resolutions was to discharge the associate and another person as employees of Child First. The affidavit confirmed that the trustees had never designated the associate to be an officer of Child First and had not authorized the associate's lawsuit against Wright. The affidavit reported the trustee's adoption of these resolutions.

{¶ 11} Respondent sent the resolutions and affidavit to the Cincinnati meeting with Wright and members of his staff. Respondent, recovering from surgery and too ill to attend, had advised Wright not to participate in the meeting because of the magistrate's order in the Child First lawsuit. Respondent's staff also brought another resolution that respondent had prepared for the meeting—a resolution for the Child First trustees to retain respondent as counsel.

{¶ 12} Wright objected to this resolution, and he and respondent apparently discussed the matter by telephone. Afterward, respondent's staff withdrew the resolution to retain respondent as counsel before offering it for the attending trustee's approval. The attending trustee signed the prepared affidavit and the remaining resolutions, however, and one of respondent's staff notarized the trustee's signature. Child First had not adopted regulations to permit one trustee to act on the board's behalf.

{¶ 13} Respondent subsequently submitted the trustee's affidavit and the corporate resolutions to the common pleas court in support of a motion for summary judgment in the Child First lawsuit. On May 30, 2001, the associate voluntarily dismissed the Child First lawsuit. Also at that time, the associate relinquished control of Child First to Wright.

## The Fee Dispute

{¶ 14} Respondent and Wright ended their attorney-client relationship on May 30, 2001, with the dismissal of the Child First lawsuit. On April 24, 2001, however, opposing counsel in the Child First lawsuit had deposed Wright.

Wright's testimony during the deposition disclosed that Wright had a history of felony convictions and other behavior that respondent found objectionable.

{¶ 15} On June 14, 2001, respondent sent a letter to Wright and enclosed a statement for legal fees in the amount of $24,543.61. On July 6, 2001, respondent sent Wright another letter, this time threatening to sue him and Child First on July 11, 2001, if arrangements had not been made by then to pay legal fees and expenses.

{¶ 16} On July 9, 2001, respondent and a family member allegedly noticed Wright following them, and respondent claims that he saw Wright gesture obscenely to him. The next day, respondent sued Wright individually and as president of Child First for legal fees and fraud. The fraud claim alleged that Wright did not inform respondent truthfully about Wright's criminal record and background. Respondent attached to his complaint Wright's deposition from the Child First lawsuit.

### The Community School Project

{¶ 17} In the spring of 2000, another client of respondent ("Client A"), who also was a lifelong friend of respondent's wife, began working on plans to open a community school in East Cleveland. Client A planned to participate in a program offered by the Ohio Department of Education that supplied startup grants for qualifying community schools and further financial assistance based on enrollment.

{¶ 18} During 1998 and 1999, Wright was also affiliated with an Akron company that operated a large number of Ohio community schools. Respondent was aware of Wright's affiliation and experience with community schools, and beginning in 2000, respondent's wife and Client A began discussing with Wright his expertise in this area. Thereafter, Wright became involved in the community school project with respondent's wife and Client A.

{¶ 19} The East Cleveland Academy ("ECA") was incorporated as an Ohio nonprofit corporation on January 30, 2001, with Client A and others serving as directors. ECA contracted with Gold Key Management Corporation ("Gold Key") for Gold Key to provide management services to the school. Gold Key is an Ohio for-profit corporation that respondent set up in June 1997. Although respondent served as the first president of Gold Key, his wife assumed the presidency in 1998, sharing responsibilities with three other corporate officers. Respondent's wife is also a beneficial owner of Gold Key.

{¶ 20} During the planning stages for ECA, Wright had encouraged certain individuals to become involved in Client A's efforts to open the community school. On his recommendation, some of Wright's acquaintances eventually undertook roles in establishing the school's location and operation. One of Wright's

acquaintances served on the ECA board of directors, and several became members of primary or secondary development teams. Wright also attended meetings concerning ECA in Akron, at the Ohio Department of Education in Columbus, and in East Cleveland.

{¶ 21} Wright anticipated that he would be compensated for these services when the school's funding came through. Client A, however, anticipated only that Wright would receive a contract for providing social services after the school opened. Client A and respondent's wife also had a financial disagreement with a member of a development team whom Wright had recommended. In the end, neither Wright nor the development-team member he recommended would receive any compensation from the ECA project.

{¶ 22} After Wright's April 24, 2001 deposition as part of the Child First lawsuit and while that litigation was still pending, respondent became concerned about Wright's continued involvement with ECA. Respondent did not want Wright to have any part in the project because of Wright's criminal record and other elements of his background. Around the same time, Client A was having what she considered unsettling confrontations with Wright and had developed her own concerns about him. Respondent disclosed Wright's felony convictions to Client A, and Client A thereafter wanted Wright to have nothing further to do with ECA, including any compensation or contracts. Wright had no involvement in the ECA project after June 9, 2001.

{¶ 23} On May 9, 2001, ECA entered into a preliminary agreement with the Ohio Department of Education. The Ohio Department of Education made "sub-grant" payments of $50,000 to ECA on June 14 and June 21, 2001. Further foundation payments of $23,222.13 each were paid, based on the school's estimated enrollment, on July 13 and August 6, 2001. ECA never opened. Under the terms of the agreement with the Ohio Department of Education, however, ECA was nevertheless entitled to retain the $100,000 sub-grants. Respondent, Gold Key, and Client A did receive payments from the sub-grants.

{¶ 24} On July 19, 2001, while acting as counsel for the school, respondent sent a letter to the ECA director whom Wright had recommended. In it, respondent noted Wright's background as revealed in his deposition in the Child First lawsuit. Respondent enclosed with the letter a copy of his complaint against Wright for legal fees and fraud and a copy of the deposition. Respondent also sent copies of this letter to the other directors on the ECA board, and at some point after June 9, 2001, respondent discussed with Client A the basis for his fraud claims against Wright.

{¶ 25} Also on July 19, 2001, respondent directed letters highlighting Wright's criminal record to an employee of the Ohio Department of Education and to the minister of a church that had been proposed as a site for ECA. Respondent timed

the July 19, 2001 letters to prevent Wright's anticipated participation in a meeting scheduled for July 20, 2001, with the Ohio Department of Education and the church. Respondent sent copies of the fee and fraud complaint and Wright's deposition to the trustee who had signed the resolutions and affidavit that resulted in the dismissal of the Child First lawsuit.

### The Disciplinary Proceedings

{¶ 26} During relator's investigation, respondent defied the investigator's attempts to learn about his representation of Wright and those involved with ECA. Respondent repeatedly replied to legitimate questions with obstreperous rhetoric, and he threatened to take legal action to stop the investigation. Moreover, as part of discussions to settle the legal fee and fraud claim against Wright, respondent negotiated with Wright's new attorney, seeking in part to have Wright sign off on letters to relator and Disciplinary Counsel that in effect withdrew Wright's grievance. The two letters were never sent, however, and respondent and Wright ultimately resolved the fee and fraud claim on other terms.

{¶ 27} The board found that respondent had violated DR 4–101(B)(1) (prohibiting unauthorized disclosure of a client confidence or secret) and (2) (prohibiting unauthorized use of a client confidence or secret to the client's disadvantage) by impermissibly disclosing Wright's criminal record and other background information to Client A, to trustees of Child First and ECA, and to the representative of the Ohio Department of Education, all in an effort to prevent Wright's further involvement in the ECA project. See DR 4–101(C)(1) through (4) (attorney's disclosure of client's confidences or secrets permissible where the client has consented, where a legal duty to reveal exists, to prevent a crime, or where necessary to collect a fee or for the attorney's defense). The board also found a violation of DR 4–101(B)(3) (prohibiting use of a client's confidence or secret for an attorney's own or another's advantage) because in disclosing the personal information about Wright, respondent purposefully acted in the interests of Client A, ECA, and Gold Key to undercut Wright's interests in being compensated for his advice or any other services he might have provided. Moreover, because respondent's disclosures were immediately responsible for the loss to Wright of these opportunities, the board also found respondent in violation of DR 7–101(A)(3) (prohibiting an attorney from causing a client damage or prejudice other than as necessary to report fraud upon a tribunal or third person).

{¶ 28} The board further found that respondent had violated DR 7–102(A)(1) (prohibiting the filing of a lawsuit that obviously serves merely to harass or maliciously injure another) by groundlessly suing Wright for fraud. Respondent had also violated DR 7–102(A)(5) (forbidding knowingly making false statements of law or fact), the board found, by (1) representing to the common pleas court in

the Child First lawsuit that the corporate resolutions were properly acted upon and valid; and (2) after dismissal of the Child First lawsuit, conceding in correspondence to Wright that the resolutions were effective only for the dismissal.

{¶ 29} The board additionally found violations of DR 5–105(A) (requiring an attorney to decline employment that is likely to compromise the attorney's independent judgment on a client's behalf) and (B) (requiring an attorney to discontinue multiple representations that are likely to compromise his or her independent judgment on a client's behalf). The board explained that respondent "continued multiple representation, despite conflicts of interest that disadvantaged some of his clients to the advantage of other clients * * *, all without full disclosure to any of the clients of the possible effects of the conflicts his * * * independent judgment on behalf of each." See DR 5–105(C) (multiple representations permissible if it is obvious that an attorney can adequately represent the interests of each client and each client consents to the representation after full disclosure), which the board found that respondent had also violated. The board further found respondent in violation of DR 2–110(B)(2) (requiring an attorney's withdrawal from employment, with a tribunal's permission where necessary, where it is obvious that continued employment will result in the violation of a Disciplinary Rule).

{¶ 30} The board found that respondent had also violated DR 1–102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation) in several respects. To obtain the dismissal of the Child First lawsuit, respondent had arranged for a trustee of Child First, whose fiduciary interests were likely to be adverse to Wright's, to ostensibly act on that board's behalf. Then, in a letter to Wright, respondent encouraged Wright to retain his services on behalf of Child First to restructure the corporation and correct whatever filing deficiencies existed. The board observed that although "[t]he evidence is not clear that the resolutions were valid or invalid in law, * * * in one or the other alternative, [respondent] engaged in misrepresentation either to the court and counsel for adverse litigants or subsequently to his client in that regard." Moreover, respondent unjustifiably threatened to sue Child First and seek a receivership when Wright did not immediately remit respondent's legal fees.

{¶ 31} Having found violations of DR 4–101(B)(1), (2), and (3); 7–101(A)(3), 7–102(A)(1) and (5); 5–105(A), (B), and (C); 2–110(B)(2); and 1–102(A)(4), the board further found that this misconduct, including respondent's extensive efforts to discredit Wright for respondent's own benefit and the benefit of others, violated DR 1–102(A)(6) (prohibiting conduct that adversely reflects on an attorney's fitness to practice law). And because respondent had attempted to derail the investigation of his misconduct by negotiating the withdrawal of Wright's griev-

ance through settlement discussions, threatening legal action, and actually filing a grievance against the investigator, among other examples, the board found respondent in violation of Gov.Bar R. V(4)(G) (requiring an attorney to cooperate in the disciplinary proceedings).

{¶ 32} In recommending a sanction for this misconduct, the board considered the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). As having mitigating effect, the board found that respondent had practiced law for 37 years and had never before been disciplined for professional misconduct. BCGD Proc.Reg. 10(B)(2)(a). The board also found that respondent's misconduct was directed against only one client. The board noted respondent's physical illness during the misconduct, although the board did not find evidence of a causal connection. The board further found that respondent, once he had retained counsel, vigorously defended himself but cooperated appropriately. BCGD Proc. Reg 10(B)(2)(d).

{¶ 33} As aggravating features, the board found that Wright had been harmed by respondent's misconduct even though evidence did not quantify any financial loss. The board was also "gravely concerned about Respondent's persisting belief that he owed no duty of loyalty or confidentiality to Wright because of Wright's criminal past" and found that respondent lacked remorse. Moreover, the board was "unable to reconcile Respondent's long practice experience with either his inability to recognize his conflicts of interest and avoid them, or with his professed lack of knowledge or perception of the total impropriety of his concerted effort to maliciously injure his former client for the benefit of other clients and for his own benefit." Doubting respondent's candor, the board thus concluded that respondent acted "entirely from selfish motives." See BCGD Proc.Reg. 10(B)(1)(b).

{¶ 34} As the sanction for his misconduct, relator proposed disbarment. Respondent initially proposed that the complaint be dismissed or that he receive no more than a public reprimand. The board, in adopting the panel's report, recommended that respondent's license to practice law be suspended for 24 months but that the final 18 months be stayed on the condition that respondent commit no further misconduct.

{¶ 35} Respondent does not contest the findings that he violated DR 7–101(A)(3), 7–102(A)(1) and (5); 5–105(A), (B), and (C); 2–110(B)(2); and 1–102(A)(4) and Gov.Bar R. V(4)(G) and, upon review, we find ample evidence of this misconduct. Respondent does object, however, to the finding that he disclosed a client's "secret" as contemplated by the language of DR 4–101(B)(1), (2), and (3). Respondent also contends that he did not use Wright's background

information to his own or another's advantage as prohibited by DR 4–101(B)(2) and (3).

{¶ 36} Under DR 4–101(A), a client "confidence" refers to "information protected by the attorney-client privilege under applicable law," and a client "secret" includes "other information gained in the professional relationship that * * * would be embarrassing or would be likely to be detrimental to the client." Under DR 4–101(B), a lawyer cannot "knowingly * * * [r]eveal" either a confidence or a secret unless permitted by DR 4–101(C). Respondent argues that Wright's criminal record was not a "secret," inasmuch as it was a matter of public record and a matter that Wright had himself revealed to others, including the ECA director whom he had recommended to Client A. Respondent further contends that his disclosure, even if it was of a secret, was not likely to be detrimental, considering the criminal background check to which Wright might have been subjected as a condition of being offered a service contract. We reject these arguments.

{¶ 37} "A fundamental principle in the attorney-client relationship is that the attorney shall maintain the confidentiality of any information learned during the attorney-client relationship." *Kala v. Aluminum Smelting & Refining Co., Inc.* (1998), 81 Ohio St.3d 1, 4, 688 N.E.2d 258. This professional duty exists to safeguard client confidences and secrets to ensure the client's complete trust in the attorney and the client's freedom to divulge anything and everything needed for the client's proper and effective representation. *Lightbody v. Rust* (2000), 137 Ohio App.3d 658, 663, 739 N.E.2d 840, discretionary appeal not accepted (2000), 90 Ohio St.3d 1424, 735 N.E.2d 901.

{¶ 38} For the purpose of DR 4–101, a "confidence" is information learned directly from the client, whereas a "secret" is defined more broadly. *In re Original Grand Jury Investigation* (2000), 89 Ohio St.3d 544, 545, 733 N.E.2d 1135. A client secret necessarily includes embarrassing or detrimental information that the client reveals, but the term also extends to embarrassing or detrimental information that is available from other sources, such as witnesses or investigative research. Id., 89 Ohio St.3d at 545–546, 733 N.E.2d 1135. Ohio's definition of a client secret is still less encompassing than that in American Bar Association Model Rules of Professional Conduct 1.6(a), which expresses "the basic principle of professional ethics that *all* information 'relating to' a lawyer's professional relationship with a client is presumptively confidential and must not be disclosed unless an exception applies." (Emphasis sic.) 1 Hazard & Hodes, The Law of Lawyering (3d Ed.2001) 9–52, Section 9.15.

{¶ 39} There being an ethical duty to maintain client secrets available from sources other than the client, it follows that an attorney is not free to disclose embarrassing or harmful features of a client's life just because they are docu-

mented in public records or the attorney learned of them in some other way. (Cf. *State ex rel. Beacon Journal Publishing Co. v. Bodiker* [1999], 134 Ohio App.3d 415, 425, 731 N.E.2d 245, holding that to the extent that DR 4–101 protects client secrets and confidences equally, a public defender's financial records about the cost of a client's defense are not embarrassing or detrimental and therefore not protected from disclosure under the public records law.) To the contrary, in only four situations may an embarrassing or harmful secret learned in the course of an attorney-client relationship be revealed: when the client has consented after being advised of the possible implications, DR 4–101(C)(1); when the Disciplinary Rules, a court order, or the law otherwise requires disclosure, DR 4–101(C)(2); when disclosure is necessary to prevent a crime the client intends to commit, DR 4–101(C)(3); or when disclosure is necessary to collect an attorney's fee or to the attorney's defense against charges of misconduct, DR 4–101(C)(4). None of these exceptions applies here.

{¶ 40} Accordingly, we find that respondent improperly disclosed the secrets of Wright's past after Wright divulged them in response to opposing counsel's questioning during Wright's deposition. As for detrimental effect, DR 4–101(A) requires no more than a probability that the disclosure of a client's secret will be "embarrassing." And here, respondent disclosed Wright's criminal record and other background information, not for any of the reasons that require disclosure under DR 4–101(C), but to warn Client A and others about Wright. Respondent acted to protect those involved in the ECA project from doing business with Wright for what he believed was their own good and the good of the school. Similarly, respondent's allegations of fraud, which were obviously unnecessary to his claim for legal fees, were intended to intimidate Wright. These disclosures surely worked to Wright's disadvantage and constituted the use of secrets at Wright's expense.

{¶ 41} Respondent testified during the hearing that Wright consented after full disclosure to representation at the same time respondent was representing clients with competing interests, including Client A. Wright did not consent in writing, however, and we see no other evidence of express consent. In fact, given the breadth of conflict that developed, one attorney should never have attempted to represent this combination of clients. Accordingly, we agree that respondent violated DR 4–101(B)(1), (2), and (3) as found by the board.

{¶ 42} Respondent also objects to the board's recommendation, taking issue with the findings of selfish motivation and lack of remorse, and now urges a one-year suspension of his law license with the entire period conditionally stayed. Upon review, we concur in the board's assessment of these aggravating features and find that respondent committed the misconduct in this case without regret to protect favored clients. Moreover, we share the board's concern as to respon-

dent's initial inability to appreciate the degree to which he compromised Wright's secrets.

{¶ 43} We also agree that respondent's misconduct warrants a 24–month suspension of his law license with a conditional stay of the final 18 months of this suspension. When an attorney violates DR 1–102(A)(4), especially to mislead a court or client, the sanction is ordinarily an actual suspension from the practice of law for an appropriate period of time. *Disciplinary Counsel v. Fowerbaugh* (1995), 74 Ohio St.3d 187, 191, 658 N.E.2d 237. Moreover, a suspension of at least two years is appropriate when an attorney compromises client interests in a conflict of this magnitude. See *Stark Cty. Bar Assn. v. Osborne* (1982), 1 Ohio St.3d 140, 1 OBR 175, 438 N.E.2d 114; *Medina Cty. Bar Assn. v. Carlson,* 100 Ohio St.3d 134, 2003-Ohio-5073, 797 N.E.2d 55 (attorney's license suspended for two years for entering into business deal with disabled client and taking advantage of entrusted information for his own financial gain); and *Bar Assn. of Greater Cleveland v. Watkins* (1981), 68 Ohio St.2d 11, 22 O.O.3d 125, 427 N.E.2d 516 (attorney's license suspended indefinitely for telling client's employer, after client filed bar grievance, about misdeeds client revealed to the attorney in confidence).

{¶ 44} Evidence of mitigation may warrant a stay of all or part of the suspension. *Cincinnati Bar Assn. v. Statzer,* 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 21. Here, although the board saw little connection between respondent's medical condition and his misconduct, respondent did undergo a serious surgery and recovery period during these events. We also see no evidence that respondent's infirmity contributed to his misconduct, but we nevertheless consider his medical condition mitigating in combination with respondent's 37 years of practice. Moreover, the depth of remorse that respondent has expressed in the proceedings before this court is encouraging and convinces us that he will not repeat these transgressions.

{¶ 45} Accordingly, we adopt the board's findings of misconduct and recommendation. Respondent is hereby suspended from the practice of law in Ohio for two years; however, the final 18 months of the suspension are stayed on the condition that respondent commit no further misconduct during the suspension period. If respondent violates this condition, the stay shall be lifted, and respondent shall serve the entire two-year suspension. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

Goldman & Rosen, Ltd., and Robert M. Gippin; Roderick Linton L.L.P. and William G. Chris, for relator.

Thomas Adgate, for respondent.