AKRON BAR ASSOCIATION *v.* HOLDER.

[Cite as *Akron Bar Assn. v. Holder,* 105
Ohio St.3d 443, 2005-Ohio-2695.]

(No. 2004–1406—Submitted January 12, 2005—Decided June 15, 2005.)

Per Curiam.

{¶ 1} Respondent, William P. Holder of Akron, Ohio, Attorney Registration No. 0015110, was admitted to the practice of law in Ohio in 1966. On June 16, 2004, we found that respondent had committed professional misconduct, including representing clients with competing interests, and suspended his license to practice for two years, staying on conditions the last 18 months. See *Akron Bar Assn. v. Holder,* 102 Ohio St.3d 307, 2004-Ohio-2835, 810 N.E.2d 426.

{¶ 2} On December 8, 2003, relator, Akron Bar Association, charged respondent in a ten-count complaint with additional violations of the Code of Professional Responsibility, some of which again stemmed from conflicts of interest. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and, based on the parties' stipulated facts and exhibits and other evidence, made findings of fact, conclusions of law and a recommendation, all of which the board adopted.

### The Netti Conflict

{¶ 3} Late in 1999, David Netti Jr. ("Netti"), Netti's wife, Marie, and Herbert Wewer consulted respondent about representing Cabin Fever Log Homes, Inc. ("Cabin Fever"), a building manufacturing business with which the Nettis and Wewer were affiliated. At the time, Mrs. Netti owned 100 percent of Cabin Fever's stock and kept the company's books and accounts, while Netti oversaw the day-to-day production and construction work. Wewer, an engineering consul-

tant with whom the Nettis had become friendly, had started to help with the business, anticipating that he would eventually share in the profits.

{¶ 4} Before Cabin Fever, Netti had owned and operated a similar business, Andover Group, Inc. Andover had gone bankrupt, and at about the same time, Netti also sought bankruptcy protection for himself. During most of the events at issue, both bankruptcies were pending in the United States Bankruptcy Court for the Northern District of Ohio.

{¶ 5} As of December 1999, three creditors had filed adversary proceedings to contest discharges in Netti's personal bankruptcy. Although Netti was at that time represented by another lawyer, Wewer and the Nettis asked respondent to take over in Netti's personal bankruptcy, to assist Cabin Fever in some legal matters, and to represent Andover against the IRS. Respondent never discussed with these four clients the possibility and extent of their conflicting interests, nor did he obtain his clients' consent despite the risks attendant to the representation.

{¶ 6} Respondent and an associate entered their appearance in the Netti bankruptcy on December 21, 1999, and the predecessor attorney immediately withdrew. On January 6, 2000, respondent wrote to the Nettis to confirm the cost of his legal services. He also confirmed in his letter some legal advice that he had given the couple. Respondent reiterated that it was necessary for Mrs. Netti to place her shares of Cabin Fever in a trust because "[i]f these actions are not taken, Mrs. Netti will be drawn into Mr. Netti's adversary cases and possibly into other law suits."

{¶ 7} According to relator, respondent had no legal basis for this advice. Creditors' claims had been pending against Netti for some time, yet Mrs. Netti was not then a party to any litigation involving her husband. Relator also faulted respondent for failing to warn that placing the Cabin Fever stock in a trust might be considered a fraudulent conveyance.

{¶ 8} Respondent later advised the bankruptcy court that his client had not paid his retainer, and in March 2000, he was permitted to withdraw. For a time thereafter, Netti represented himself against creditors' claims. In earlier proceedings involving one of these claims, Netti had failed to produce requested documents and walked out of a deposition. The creditor had responded by moving to compel this discovery.

{¶ 9} The bankruptcy court had scheduled a pretrial in this creditor's claim for June 14, 2000. Netti did not attend, nor did any attorney appear on his behalf. On June 19, 2000, the court granted the creditor's motion to compel and ordered Netti to comply with discovery, including resumption of his deposition.

{¶ 10} The Nettis subsequently rehired respondent and, on June 28, 2000, paid him $3,500. Respondent's billing records reflect that he accepted this fee to provide legal services to Cabin Fever, Andover, and the Nettis on various matters and that he charged for some services within the next few days. Respondent's accounts also reflect charges for work that he performed between July 1 and July 31, 2000, for Netti individually relative to the discovery order in the creditor's claim.

{¶ 11} On July 5, 2000, the creditor's counsel moved for default judgment and sanctions, arguing that Netti had failed to appear for his rescheduled deposition on July 3, 2000, to produce documents, and to pay costs as ordered. On July 14, 2000, respondent filed an appearance and a trial brief. Respondent failed, however, to respond to the motion for default judgment.

{¶ 12} On July 21, 2000, the bankruptcy court granted the motion for default and sanctions, thereby denying Netti discharge of a debt in excess of $98,000. The court also ruled that respondent's trial brief was untimely. Respondent filed for reconsideration of the default on July 31, 2000, and impliedly blamed Netti for the lack of any response, falsely representing to the court that Netti had waited until mid-July 2000 to rehire him.

{¶ 13} The bankruptcy court scheduled a hearing on the creditor's motion for attorney fees for July 31, 2000, and respondent sent his associate to appear. Although the motion for reconsideration had not yet made its way to the judge, the associate argued in favor of reconsideration. Per respondent's motion, the associate also misrepresented to the court that Netti had rehired respondent in mid-July. The associate did not oppose the creditor's claim for fees, advising the court that she was there only to "monitor" the proceedings. The court thereafter denied the motion for reconsideration, finding that Netti had been uncooperative and bore responsibility for not having promptly retained counsel.

{¶ 14} In an interview with relator's investigators on July 31, 2003, respondent continued to deflect responsibility for his failure to oppose the motion for default. This time, however, respondent reported that the bankruptcy judge had discussed the creditor's motion for default with him ex parte and had promised to grant judgment against Netti regardless of anything respondent might file. Netti testified before the panel that respondent had previously told him the same thing. Respondent repeated this story under oath at the hearing. The judge flatly denied respondent's claim, and the panel credited the judge's denial over respondent's testimony.

{¶ 15} In the months that followed the default judgment, respondent and Wewer prevailed upon Mrs. Netti to set up a trust for her Cabin Fever stock. She was reluctant, but respondent helped to convince her that after the default her shares were at risk from her husband's creditors. On September 13, 2000,

the Nettis executed the Netti Irrevocable Trust and, on respondent's advice, Wewer became trustee.

{¶ 16} Respondent, who had earlier expressed interest in becoming a member of Cabin Fever's board of directors, drafted the trust documents for the Nettis and named the Nettis and their two children as beneficiaries. Respondent also advised Wewer of his fiduciary responsibilities as trustee; however, he still did not discuss the possible competing interests presented by his representation of Wewer, the Nettis, and Cabin Fever. Consequently, none of respondent's clients consented to or waived the conflict.

{¶ 17} On September 15, 2000, the Cabin Fever stock was transferred to Wewer as trustee. On respondent's advice, Wewer afterward elected himself Cabin Fever's sole corporate director and officer. The company retained respondent as counsel, and Wewer, acting on Cabin Fever's behalf at a consent meeting, ratified all of respondent's actions up until that point. Respondent and Wewer repeated this process later in 2000 and again for the purpose of corporate business that Cabin Fever conducted in 2001 and 2002.

{¶ 18} As trustee, Wewer began to take a much more active role in the management of Cabin Fever. Although the Nettis and an office manager also shared some responsibility, Mrs. Netti was gradually phased out of larger operational decisions, and she eventually stopped receiving her monthly checks. Eventually, Netti also lost control over the company's finances, continuing to be involved only in production and construction.

{¶ 19} Respondent continued to represent Cabin Fever, Andover, and the Nettis in various disputes until June 2003, including the Andover bankruptcy, Netti's personal bankruptcy, and a zoning controversy involving Cabin Fever in Portage County. The Andover bankruptcy closed on November 7, 2000, and the Netti bankruptcy concluded on March 6, 2002, both without any discussion or waiver of potential and actual conflicts.

{¶ 20} Among his other duties for Cabin Fever, respondent also collected from Netti's cousin on an overdue account. From September 2000 until February 26, 2001, the day before undergoing major surgery, respondent collected four checks from the cousin totaling $3,750, each made payable to Cabin Fever. Respondent negotiated these checks and retained the funds without authority. In fact, respondent did not mention these receipts, despite earlier inquiries, until he told Wewer about them in mid–2001. Only then did Wewer authorize respondent to apply the funds to outstanding fees.

{¶ 21} Respondent represented that he had deposited the collected funds in his IOLTA account; however, the bank records that respondent produced did not reflect any such deposits. The panel did not consider these records reliable and found that respondent had withheld or destroyed relevant documents.

{¶ 22} In addition to acting as trustee for the Netti trust, Wewer also served as trustee for a charitable remainder trust and an education trust for the benefit of family and friends, both created by his aunt. On March 28, 2000, Wewer, d.b.a. Grace Investment, lent $25,000 to Cabin Fever from the proceeds of one or both of his aunt's trusts. No note documented the loan, which was allegedly to be repaid by July 14, 2000, with 1.5 percent interest. On June 21, 2000, Wewer arranged for Grace Investment to lend Cabin Fever another $25,000, this time entirely from his aunt's education trust. Cabin Fever's records accounted for this advance as a loan, but again the loan terms were not reduced to writing.

{¶ 23} Sometime in September 2000, respondent advised Wewer to obtain a security interest to protect the aunt's education trust and prepared for this purpose a cognovit note, security agreement, and financing statements. On September 28, 2000, Wewer executed these documents in his capacities as president of Cabin Fever and trustee. Despite the competing interests of Wewer, Cabin Fever, and the Nettis, no potential conflicts were discussed or waived.

{¶ 24} On October 10, 2000, Wewer advanced another $25,000 to Cabin Fever through Grace Investment, this time from the aunt's charitable trust. Respondent prepared a cognovit note, security agreement, and financing statements that Wewer signed in his dual capacities as before. Once again, potential conflicts of interests were neither discussed nor waived.

{¶ 25} In time after the default judgment, Netti came to mistrust respondent and tried to persuade Wewer to retain another attorney for Cabin Fever and all their other legal concerns. Netti and Wewer tried to resolve this and other issues between them, but in the end, Wewer decided to stay with respondent.

{¶ 26} By the beginning of 2002, the relationship between Wewer and Netti had completely soured. In April of that year, Netti formed a new company, Cabin Fever Log Structures, Inc. ("Structures"). Through this entity, Netti would later conduct business at Cabin Fever's location, using Cabin Fever's equipment, employees, and material to fill existing orders.

{¶ 27} Netti also retained another attorney. Respondent, however, continued to represent Wewer, counseling Wewer in his personal affairs, as trustee of the Netti trust, as sole director and officer of Cabin Fever, and as trustee of Wewer's aunt's trusts, all to his former clients' potential detriment. In July 2002, Wewer authorized Cabin Fever to file a Chapter 11 petition for corporate reorganization, with respondent preparing and filing the necessary documentation. No one consented to or waived the conflict of interest presented by respondent's representation.

{¶ 28} On July 23, 2002, acting as debtor's counsel for Cabin Fever, respondent corresponded directly with Netti, sidestepping his former client's new lawyer. In

his letter, respondent demanded Netti's cooperation with the United States Justice Department's trustee in the bankruptcy, but in an apparent attempt to intimidate Netti, he referred to the Chapter 11 proceedings as pending before the United States Department of Justice and fabricated that enforcement agency's concern about Wewer's lack of access to Cabin Fever property.

{¶ 29} A week or so later, Wewer authorized, again on respondent's advice, a petition to convert Cabin Fever's bankruptcy to a Chapter 7. Continuing in his capacity as debtor's counsel, respondent prepared and filed the paperwork. Again, no conflict of interest was discussed.

{¶ 30} On August 7, 2002, Netti reported respondent to relator and an investigation ensued. By the end of January 2003, however, respondent was still embroiled in the Cabin Fever bankruptcy proceedings, having prepared and filed proofs of claim for Wewer individually, for Wewer as trustee of his aunt's two trusts, and on his own behalf to recover fees for prepetition professional services. In these and other filings, respondent directly challenged Netti's interests, and on January 29, 2003, the bankruptcy trustee moved to disqualify respondent for conflict of interest. Finally, in June 2003, respondent withdrew his services and proof of claim from the proceedings.

## The Disciplinary Proceedings

{¶ 31} In response to relator's investigation, respondent wrote a letter, dated November 12, 2003, that implicitly misrepresented the foregoing events. He wrote that the Nettis had wanted Wewer to take over the day-to-day operations of Cabin Fever, implying their wholehearted agreement in the irrevocable trust and Wewer's appointment as trustee. Respondent blamed adverse judgments that had been granted in Netti's personal bankruptcy on Netti's misbehavior, never mentioning the default judgment entered due to his own neglect. Respondent also wrote that he had authority to apply the collection receipts to "open invoices" in his office, again failing to mention that he actually paid himself with the money. In addition, respondent's letter denied glaring conflicts of interest that he had earlier acknowledged during his July 31, 2003 interview and to which he would later stipulate.

{¶ 32} The November 12 letter also contained disparaging remarks designed to attack Netti's credibility. Apparently to dismiss his former client as a malcontent, respondent wrote that Netti had been "discharged by at least two of his attorneys" before hiring respondent and "at least one more since." Respondent described Netti's courtroom behavior as "deplorable" and lambasted Netti as "clearly not qualified" to run a business. Finally, respondent gratuitously submitted in the letter that Netti "has not yet been charged with any criminal wrongdoing," implying that charges were imminent when they were not.

{¶ 33} The panel concluded that respondent had also failed to encourage Wewer to cooperate during relator's investigation. The two men admitted that they had met the day before a meeting for which relator had subpoenaed Wewer's appearance, yet both denied that they had discussed the investigation. The panel inferred from this and Wewer's lack of response to investigative inquiries that Wewer had deliberately refused to cooperate until he was forced to by subpoena. Moreover, the panel doubted respondent's statement that he had produced all documents pertinent to relator's investigation, inasmuch as respondent could produce no detailed billing records for services charged to any of the involved clients.

## Misconduct

{¶ 34} For his simultaneous representation of the Nettis, Wewer (individually and as the director and officer of Cabin Fever and as trustee of the Netti trust and the aunt's charitable and education trusts), Cabin Fever (as a corporation and as a debtor in bankruptcy), and himself (as a claimant in bankruptcy), the panel found that respondent had violated DR 5–105(A) (requiring an attorney to decline employment that is likely to compromise the attorney's independent judgment on a client's behalf) and (B) (requiring an attorney to discontinue multiple representations that are likely to compromise his or her independent judgment on a client's behalf, unless the client consents after full disclosure of attendant risks) and 2–110(B)(2) (requiring an attorney's withdrawal from employment, with a tribunal's permission where necessary, where it is obvious that continued employment will result in the violation of a Disciplinary Rule). Based on respondent's stipulation to these violations, we agree that respondent committed the misconduct charged in Count I.

{¶ 35} As to Count II, the evidence establishes multiple violations of DR 1–102(A)(4) (prohibiting conduct involving fraud, deceit, dishonesty, or misrepresentation). Consistent with the board's report, we find that respondent (1) misrepresented to the bankruptcy court the date on which he had been rehired, (2) falsely advised Netti, relator's investigators, and the hearing panel that the bankruptcy judge had initiated an ex parte and prejudicial conversation with him, (3) used the default judgment granted against Netti to win Netti's wife's consent to the irrevocable trust, (4) negotiated checks to Cabin Fever without authority and kept the proceeds, and (5) attempted to mislead relator's investigators with his November 12, 2002 letter.

{¶ 36} In addition, we adopt the board's finding relative to Count III that respondent violated DR 8–102(B) (prohibiting a lawyer from knowingly making a false accusation against a judge) by falsely accusing the bankruptcy judge of not acting impartially.

{¶ 37} As to the charges in Count IV that respondent misappropriated and failed to properly account for the collection receipts he retained as fees, we further find, as did the board, that respondent violated DR 9–102(A) (requiring lawyers to maintain client funds in a separate, identifiable bank account), and (B)(1) (requiring a lawyer to promptly notify client of having received client's funds), (3) (requiring a lawyer to maintain complete records of and account for client funds in lawyer's possession), and (4) (requiring a lawyer to promptly pay client funds to which client is entitled).

{¶ 38} With respect to Count V, the panel concluded that respondent had deliberately failed to protect Netti's interests in regard to the motion for default judgment in Netti's bankruptcy. We see no evidence of this intent and find instead that he inadvertently neglected this duty. Thus, we further find violations of DR 6–101(A)(2) (requiring a lawyer to prepare adequately for client's representation) and (3) (prohibiting a lawyer from neglecting a legal matter).

{¶ 39} We also adopt the board's findings under Count VI that respondent violated DR 7–102(A)(3) (prohibiting a lawyer from failing to disclose what he is required by law to reveal) and (5) (prohibiting a lawyer from knowingly making a false statement of law or fact) by misrepresenting to the bankruptcy court the date on which Netti rehired him to defend against the creditor's claim. We also find, as did the board, a second violation of DR 7–102(A)(5) based on the tactics respondent used to set up the Netti trust.

{¶ 40} For the attempts to intimidate Netti in his July 23, 2002 letter and for this direct communication with Netti without consent of counsel, we also adopt the board's findings as to Count VII that respondent violated DR 7–102(A)(1) (prohibiting a lawyer from acting merely to harass another during representation) and 7–104(A)(1) (prohibiting a lawyer from impermissibly communicating with a represented party).

{¶ 41} As to Count VIII, the evidence established respondent's lack of candor and cooperation in relator's investigation. Thus, we also adopt the board's findings that respondent violated Gov.Bar R. V(4)(G) and DR 1–102(A)(1) (prohibiting the violation of a Disciplinary Rule). We do not, however, find that respondent violated DR 1–102(A)(2) (prohibiting a lawyer from circumventing a Disciplinary Rule through the actions of another) as charged in Count IX. The board found this misconduct by loosely inferring from surrounding events that respondent had instructed his associate to deceive the bankruptcy court and that he had also instructed Wewer not to cooperate during the investigation. Clear and convincing evidence was not shown.

{¶ 42} Finally, inasmuch as the breadth and variety of respondent's disciplinary violations reflect adversely on his fitness to practice law, we also adopt the

board's finding under Count X that respondent violated DR 1–102(A)(6) (prohibiting conduct adversely reflecting on fitness to practice law).

{¶ 43} In finding this misconduct, we overrule respondent's objections to the board's report. Except for the conflicts of interest to which he stipulated in Count I, respondent challenges all other findings of misconduct, arguing that the board's review should have been limited to the stipulations and not extended to his many other improprieties. He urges us to return this cause to the board for further proceedings before a different panel, in effect, to allow him to raise a better defense to the charges.

{¶ 44} Respondent cites no law or fact that supports a rehearing. Relator charged from the beginning and throughout these proceedings that respondent had committed ethical breaches far in excess of the allegations in Count I. Moreover, the board's findings are amply supported by the stipulations, testimony, and numerous exhibits that the parties submitted by agreement after the hearing. And contrary to relator's unproven claims of bias and prejudice, we find that the panel and relator's counsel carried out their duties admirably in response to this conflict-of-interest case.

## Sanction

{¶ 45} In recommending a sanction for this misconduct, the panel considered the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). In aggravation, the panel found that respondent's multiple representations and other transgressions caused considerable harm. BCGD Proc.Reg. 10(B)(1)(h). Among other losses, the Nettis lost ownership and control of Cabin Fever, including the payments that Mrs. Netti had once periodically received. Moreover, the default judgment entered against Netti precluded the discharge of approximately $100,000 in debt and interest, and respondent retained some $3,750 of Cabin Fever's money without permission.

{¶ 46} The panel found that respondent also had a significant disciplinary record of similar misconduct for which his license to practice remains under suspension. BCGD Proc.Reg. 10(B)(1)(a). See *Akron Bar Assn. v. Holder*, 102 Ohio St.3d 307, 2004-Ohio-2835, 810 N.E.2d 426. And as relator argues, respondent acted dishonestly and in his own self-interest, committed a pattern of misconduct with multiple victims, and impeded the investigation of his ethical infractions. BCGD Proc.Reg. 10(B)(1)(b) through (e). Finally, respondent acknowledged only a portion of his misconduct and made no restitution. BCGD Proc.Reg. 10(B)(1)(g) and (i).

{¶ 47} Little mitigation was presented. The panel noted that respondent had cooperated during the proceedings before the panel. And although he underwent major surgery during the events at issue, nothing established that his infirmity caused the misconduct.

{¶ 48} Relator advocated respondent's permanent disbarment. Respondent made no recommendation at the panel hearing. The board adopted the panel's findings of fact, conclusions of law, and suggested sanction, recommending that respondent be indefinitely suspended from the practice of law, with this suspension to run concurrently with respondent's current suspension.

{¶ 49} Objecting to the board's recommendation, relator continues to argue for respondent's disbarment, citing precedent under which respondent could be disbarred for the serial offenses in which he has engaged. As we said in *Disciplinary Counsel v. Lantz*, 102 Ohio St.3d 93, 2004-Ohio-1806, 807 N.E.2d 298, ¶ 15, and *Richland Cty. Bar Assn. v. Brickley*, 97 Ohio St.3d 285, 2002-Ohio-6416, 779 N.E.2d 750, ¶ 24, "Disbarment is ordinarily the sanction when an attorney's misconduct permeates his practice in the way that respondent's misconduct did in this case." Moreover, we remain confounded by respondent's inability to appreciate the attendant risks of his multiple representations and his indifference to compromising some clients' interests while protecting others.

{¶ 50} In *Cleveland Bar Assn. v. Harris*, 96 Ohio St.3d 138, 2002-Ohio-2988, 772 N.E.2d 621, however, a lawyer committed equally serious misconduct by misappropriating funds from an incapacitated client and then attempting to conceal his theft. We did not disbar the lawyer because he had practiced for many years without discipline and the board had recommended an indefinite suspension. We imposed this lesser sanction, albeit not without dissent.

{¶ 51} Respondent has practiced nearly 40 years. He has a recent record of serious discipline, although all these events took place at around the same time and during part of them he was recuperating from very invasive surgery. Moreover, in considering an indefinite suspension, we note that the record contained two mitigating character letters, one from a Summit County domestic relations magistrate, commending respondent's integrity and competence.

{¶ 52} We therefore decline to disbar respondent and adopt the board's recommendation to indefinitely suspend. Respondent is hereby indefinitely suspended from the practice of law in Ohio. Because of the egregiousness and prevalence of his disciplinary violations, however, respondent will serve this suspension after he completes his current suspension in accordance with *Akron Bar Assn. v. Holder*, 102 Ohio St.3d 307, 2004-Ohio-2835, 810 N.E.2d 426. The length of this sanction, together with the requirements for respondent's reinstate-

ment to the Ohio bar if he seeks readmission, is sufficient protection for the public under the circumstances. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Goldman & Rosen, Ltd., and Robert M. Gippin; and Roderick Linton L.L.P., and William G. Chris, for relator.

Thomas L. Adgate and Pamela J. Holder, for respondent.