In re Application of Yazdian.

[Cite as *In re Application of Yazdian,* 112
Ohio St.3d 409, 2006-Ohio-6585.]

(No. 2006–1406—Submitted November 29, 2006—Decided December 20, 2006.)

**Per Curiam.**

{¶ 1} The applicant, Reza Yazdian, a May 2003 graduate of the Thomas M. Cooley School of Law in Lansing, Michigan, has tried for some time to establish his character, fitness, and moral qualifications for admission to the Ohio bar.

{¶ 2} The applicant initially applied to take the July 2003 bar examination. After a series of proceedings, the Board of Commissioners on Character and Fitness approved the applicant's character, fitness, and moral qualifications and allowed him to take the February 2004 bar exam. He did not receive a passing score.

{¶ 3} The applicant reapplied to take the July 2004 bar exam; however, events intervening between the board's prior approval and his reapplication caused the board to reconsider and authorize further proceedings to examine the applicant's character and fitness. These proceedings, which implicated the proceedings that delayed the applicant's first attempt to take the bar exam, ultimately resulted in the board's July 25, 2006 report and recommendation (1) to disapprove the application to take the bar examination and (2) to prohibit the applicant from reapplying until February 2007. The applicant objects to the board's report and recommendation.

The Process Leading to the Initial Approval of the Applicant's
Character, Fitness, and Moral Qualifications

*The Interview Process*

{¶ 4} The applicant first applied on March 31, 2003, to take the Ohio bar examination. As part of the application process, Claudia Allen and Kent Britt, members of the Cincinnati Bar Association ("CBA") admissions committee,

interviewed the applicant to assess his character, fitness, and moral qualifications in accordance with Gov.Bar R. I(11)(B).

{¶ 5} On separate interviewer report forms, Allen and Britt each expressed concern that the applicant's excessive record of traffic citations suggested a disregard of the law, a potentially disqualifying factor under Gov.Bar R. I(11)(D)(3)(f). Allen expressed several other concerns: (1) the applicant appeared unapologetic for his traffic record, (2) his application materials were poorly written, and (3) the applicant's attitude seemed defensive, defiant, and volatile. In addition, when asked on the form whether the applicant possessed the necessary attributes for bar admission, Allen wrote, "Yes—barely," whereas Britt entered an unqualified yes. Nevertheless, both interviewers gave the applicant unqualified approval in their combined recommendation to the full committee, and, on July 8, 2003, the admissions committee relayed that unqualified approval to the board, together with the forms filled out by the interviewers, in a final report.

*The Board's Review*

{¶ 6} By letter dated July 8, 2003, the Supreme Court Bar Admissions Office, acting on the board's behalf, advised the applicant of the CBA bar admissions committee's provisional approval. But in a July 16, 2003 letter, the admissions office notified applicant that the recommendation had not been accepted. Instead, the board had determined that issues relating to his "excessive traffic violations and disregard for the law and the bar admissions process" warranted further review. As a result, the letter continued, the board had sua sponte appointed a hearing panel to investigate the cause pursuant to its authority under Gov.Bar R. I(10)(B)(2)(e).

{¶ 7} On October 20, 2003, a panel of three commissioners heard evidence on the character and fitness issues identified by the board ("the 2003 hearing"). In its report to the board, the panel noted concerns similar to those of the CBA admissions committee interviewers, but like them, did not consider the issues significant enough to disapprove the applicant's character and fitness. The panel thus recommended that the applicant be approved to sit for the February 2004 bar examination, and at its February 9, 2004 meeting, the board adopted the panel's recommendation.

{¶ 8} The applicant took but did not pass the February 2004 bar examination.

### The Process Leading to the Disapproval of the Applicant's Character, Fitness, and Moral Qualifications

*Events Intervening Between the Board's Preliminary Approval and the Applicant's Reapplication for the Bar Exam*

{¶ 9} At some point, purportedly before he received his bar examination results, the applicant retained Melancthon W. Chatfield as legal counsel to

contest what they asserted was Allen's improper contribution to the board's review. In an April 27, 2004 letter to the CBA's general counsel, Chatfield complained on the applicant's behalf that Allen's uncomplimentary remarks were the catalyst that triggered the board's sua sponte investigation and prevented the applicant from taking the July 2003 bar examination. As the parties firmly agree, the letter leveled very serious charges.

{¶ 10} The April 2004 letter accused Allen personally of having had "a conflict of interest that would affect her judgment in the interview process" and warned that the ordeal had the applicant "outraged as the son of a first generation Iranian immigrant." The letter claimed that Allen had antagonized the applicant with repetitious questions, that she had appeared at the 2003 hearing unprepared, and that she had not shown deference to the panel. The letter described Allen's opening remarks at the 2003 hearing as full of unjust personal assaults against the applicant. As a foil to the attacks attributed to Allen, the letter continued that the applicant was at that time "employed and * * * working alongside Mr. Kent Britt, contradicting Ms. Allen's character analysis."

{¶ 11} In the end, the letter advised that the applicant had suffered mental anguish from the bar application process and that he had been "left as a result with a forty thousand dollar legal debt and expenses which have left him financially destitute." The letter demanded that the CBA sanction or remove Allen from conducting admissions interviews because the applicant felt that she had "proven herself to be unfit to conduct such character interviews." The letter further asked the CBA to seek restitution for the applicant in reparation for Allen's actions and implored the CBA to take the expressed concerns seriously because the applicant had suffered "irreparable loss." The letter concluded:

{¶ 12} "We believe that we will be able to show that Ms. Allen did not act in accordance with rules and procedures of the Supreme Court of Ohio admissions committee process. Mr. Yazdian is prepared to file racial discrimination and ethical violation charges through the Cincinnati Bar Association against Ms. Allen if this matter is not taken seriously."

{¶ 13} Assistant counsel for the CBA promptly replied to the April 2004 letter to assure the applicant and his lawyer that Gov.Bar R. I provided for the board's invocation of sua sponte investigative authority. Her letter also advised that she had conferred with Allen and Britt and found no evidence to support their otherwise unsubstantiated allegations of impropriety. On behalf of his client, Chatfield quickly wrote back to express his dissatisfaction with the assistant counsel's reply. He insisted that without Allen's "inappropriate written commentary," the board "would never have scrutinized Mr. Yazdian's application to the bar" and that his client had suffered the "devastating consequences" described in his earlier letter. To this, the assistant counsel immediately replied that the

applicant's case was not the first in which the board invoked sua sponte investigative authority and that, because of the applicant's allegations, the CBA was requesting his next bar exam application be assigned to another bar association for review. Several months later, Chatfield advised in writing that his client had decided not to pursue his claim against the CBA or Allen and that he had made his decision back in April of that year.

*The Second Interview Process*

{¶ 14} When the applicant reapplied to take the bar examination to be administered in July 2004, the admissions office asked the Dayton Bar Association ("DBA") to commence the character and fitness review process, and the DBA agreed. On July 6, 2004, after studying the application materials, the chairman of the DBA's admissions committee recommended approval.

*The Board's Review*

{¶ 15} In a July 13, 2004 letter, the admissions office notified the applicant that the board had again exercised its authority sua sponte to appoint a hearing panel to conduct further proceedings in his case. The board's primary focus this time, as the letter advised, would be to explore the allegations raised in the April 27, 2004 Chatfield letter thoroughly, inasmuch as neither the applicant nor his counsel had provided support for their serious claims.

{¶ 16} On November 11, 2004, a second panel of three commissioners heard evidence on the allegations of impropriety identified by the board (the "2004 hearing"). The applicant testified at length at that hearing, but the panel found that he offered no persuasive evidence suggesting that Allen's written remarks resulted from anything more than a possible personality conflict (as compared to a conflict of interest or racial animus), or even to support his claim that Allen had assessed his character in a way that differed substantially from Britt's assessment. The panel also found that although the applicant never recanted the charges of bias, he attempted to disavow his counsel's claims and accusations throughout the hearing.

{¶ 17} Thus, although the panel noted the applicant's academic achievements, his charitable contributions to the community, and his established good character apart from the incidents surrounding the April 27, 2004 letter, the panel found that the applicant was unable to accept criticism, constructive or otherwise, and that he was also unable to acknowledge that character flaw. Finding that these shortcomings manifested a lack of good judgment and integrity, both essential qualities for all lawyers, the panel recommended disapproval of the applicant's character and fitness insofar as his reapplication to take the bar exam. The panel further recommended, however, that the applicant be permitted to reapply to take the bar examination to be administered in February 2007, as he might at

that time be better able to demonstrate character, fitness, and moral qualifications acceptable to the board.

{¶ 18} Upon presentation of the panel's report and recommendation, the board remanded the cause to the panel for clarification of two possible misrepresentations—the statements in the April 27, 2004 Chatfield letter that the applicant had become "financially destitute" and that he was employed by and had been "working alongside Mr. Kent Britt." In a letter dated February 11, 2005, the admissions office notified the applicant of this development.

{¶ 19} On November 3, 2005, a third panel of three commissioners heard evidence concerning the applicant's financial and employment status (the "2005 hearing"). The panel also accepted testimony from both of the applicant's interviewers to investigate further the allegation of bias.

{¶ 20} The board had concerns that the applicant had misrepresented his dire financial situation in the April 2004 letter because just six months earlier, at the 2003 hearing, he had represented that he was financially secure. At the 2005 hearing, the applicant documented for the panel the $40,000 in debt that he supposedly incurred from expenses related to the 2003 hearing. He agreed that "destitute" might not have been the best word to describe his financial condition. As a result, the panel considered the applicant's assertion of destitution an inaccurate statement.

{¶ 21} The board also had concerns that the applicant may also have misrepresented his close working relationship with Britt. The panel learned that Britt and the applicant had, in fact, worked together. When Britt was assigned by his law firm to indirectly oversee a large document-review project, the applicant was one of the temporary employees hired to help. On one or more occasions, Britt and the applicant had been in the same room for the same project. Thus, while the representation that the applicant had "worked alongside" Britt was technically true, it was also a patent overstatement with which the applicant, through counsel, created a false impression.

{¶ 22} With respect to any residual doubts about the CBA interview process, the parties and panel inquired exhaustively of Allen and Britt. Britt recalled that he and Allen had shared the same concerns about some of the applicant's answers and reactions in caucus following the interview, however differently they may have expressed those concerns on their interview forms. Britt also recalled that Allen had acted no differently in any of the other six or seven interviews they conducted that day than she had during the applicant's interview. Based on the testimony from interviewers and the applicant, the panel concluded that Allen and Britt had conducted themselves professionally, courteously, and appropriately throughout their interview with the applicant and again found no evidence to suggest any impropriety.

{¶ 23} In their supplemental report to the board, the panel renewed its recommendation to disapprove the application and to allow the applicant to reapply to take the February 2007 bar examination. Adopting the report and supplement, the board also recommended disapproval of the applicant's character and fitness and further recommended that he be permitted to reapply to take the upcoming February 2007 bar exam.

### Applicant's Objections to the Board Report and Recommendation

{¶ 24} The board disapproved the applicant's character and fitness mainly because after raising suspicions about one of his interviewers having a racial or cultural prejudice, he then persistently refused to recognize, despite all evidence to the contrary, that he had mistaken her motivation. We agree that this reflected questionable judgment and integrity and warranted the board's disapproval. Indeed, even longstanding members of the Ohio bar are subject to sanction for abject refusal to recognize the need to change their ways because it can and often does either lead to a breakdown in the process to dispense justice or work to a client's detriment. See, e.g., *Disciplinary Counsel v. O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, and *Akron Bar Assn. v. Holder,* 105 Ohio St.3d 443, 2005-Ohio-2695, 828 N.E.2d 621. The board was thus justified in identifying this character flaw for remediation before granting the applicant the privilege of taking the Ohio bar examination.

{¶ 25} In his objections, the applicant essentially argues that the statements regarding his financial and employment status were too insignificant by themselves to counter the other evidence of his good character and fitness. He also now acknowledges that at worst, his interview experience could be described as a personality conflict between him and Allen, and nothing more. We acknowledge these concessions.

{¶ 26} Having found that the board has properly disapproved the applicant's character and fitness, we adopt the board's report and recommendation and overrule the applicant's objections. The applicant may reapply to take the Ohio bar examination to be administered in February 2007.

Judgment accordingly.

Moyer, C.J., Abele, Pfeifer, Lundberg Stratton, O'Connor, O'Donnell and Lanzinger, JJ., concur.

Peter B. Abele, J., of the Fourth Appellate District, sitting for Resnick, J.

---

Porter, Wright, Morris & Arthur, L.L.P., and Andrew J. Gottman, for relator.

Dianna M. Anelli, for respondent.