MEDINA COUNTY BAR ASSOCIATION v. CARLSON.

[Cite as *Medina Cty. Bar Assn. v. Carlson,*
100 Ohio St.3d 134, 2003-Ohio-5073.]

(No. 2003–0400—Submitted June 24, 2003—Decided October 8, 2003.)

**Per Curiam.**

{¶ 1} Respondent, Christopher Thomas Carlson of Medina, Ohio, Attorney Registration No. 0062450, was admitted to the Ohio bar in 1993. On June 17, 2002, relator, Medina County Bar Association, filed a complaint charging respondent with professional misconduct, including violations of DR 5–103(A) (acquiring an improper proprietary interest in the subject matter of the litigation that the attorney is conducting for a client) and 5–104(A) (improperly entering into a business transaction with a client). A panel of the Board of Commissioners on Grievances and Discipline heard the cause and made findings of fact, conclusions of law, and a recommendation.

{¶ 2} Evidence before the panel established that in the fall of 2000, respondent agreed to represent a client in proceedings stemming from the client's failure to clean up his 94–acre property after the Medina County Health Department had, in 1994, declared it to be a public nuisance. The property was undeveloped farm land in Medina County in an area where nearby property owners were commer-

cially developing their land. The client kept on his property a large collection of rusting automobiles, trucks, trailers, and other out-of-commission vehicles, dilapidated machinery, and refuse. The client, who was known for his lack of personal hygiene, raised pigs on the property. By the time he retained respondent, the client had served a 20–day jail term for contempt for failing to clean up the premises.

{¶ 3} On July 25, 2000, the client signed a six-month exclusive-right-to-sell agreement with a real estate agent. That same day, the real estate agent placed three "for sale" signs along the front of the property, which could be seen from the road. The signs remained on the property for the ensuing months. The listed price was $975,000 and was reported on July 28, 2000, on the front page of a local newspaper in an article about the client and his legal troubles. According to the Medina County Auditor's most recent appraisals in 1998 and 1999, the value of the property was $182,600.

{¶ 4} The client gave respondent a $1,500 retainer to represent him in the health-code proceedings. Respondent visited the client's property on October 16, 2000, to inspect it, to evaluate cleanup efforts already underway, and to plan further efforts to make ordered improvements. He also conferred with counsel for the health department about this process and its progress. At the panel hearing, a member of the Medina County Prosecutor's Office, one of the attorneys representing the health department, testified that in the first week of October he had advised respondent that the property was about to be sold to a buyer who intended to clean up the site for development.

{¶ 5} On Thursday, October 19, 2000, respondent entered into an agreement with his client to purchase the property. Respondent testified that his client had named the purchase price—$5,000 immediately, another $5,000 to be paid later, and assumption of a $42,500 mortgage on the property. Respondent testified that he had merely agreed to the sale.

{¶ 6} The next day, October 20, 2000, respondent inquired of two separate environmental protection agencies whether there were any pending complaints or other problems with the property and discovered that there was none. He also acquired title documents that reflected a variety of facts about the property, including the appraised value and the existence of various oil and gas leases, the unsatisfied mortgage, and the availability of sewer, gas, and electricity.

{¶ 7} Also on that day, respondent called an attorney whom his client had allegedly selected to replace respondent in representing him and offered him the unearned portion of his retainer, $1,000, to represent the client. That attorney, who had formerly worked in a law office with respondent, agreed to represent the client in the health-code proceedings, but declined to represent him in the real estate transaction because he had no experience in that area. The new attorney

did agree to transfer the two $5,000 payments from respondent to the client and to witness documents as needed.

{¶ 8} The following day, Saturday, October 21, 2000, the client's real estate agent presented him with a purchase agreement for the sale of his property to a prospective buyer who offered $5,000 an acre, for a total price of approximately $470,000.[1] The client signed this purchase agreement.

{¶ 9} On October 23, 2000, respondent prepared a purchase agreement, a general warranty deed, and two identical documents entitled "Authorization/Acknowledgment." The Authorization/Acknowledgment documents provided:

{¶ 10} "I, [the client], hired Attorney Chris Carlson on September 27, 2000 for the purpose of defense of a civil contempt action filed in the Common Pleas Court of Medina, Ohio. On Thursday, October 19, 2000, I asked Attorney Carlson if he wanted to buy my property consisting of approximately 100 acres located at 9442 Avon Lake Road, Lodi, Ohio. Attorney Carlson advised that he could not enter into a business transaction with me of this type and still be my attorney unless I fully consented to his continued representation of me. After discussions with Mr. Carlson I fully understand the nature of the conflict. Although I consent to Attorney Carlson continuing to represent me in the continuing contempt action, Attorney Carlson advised that the best course for me would be for me to hire another attorney for representation in the civil contempt action and the sale of my real estate to Attorney Carlson. Attorney Carlson has never requested, asked, or even suggested that I sell him my real estate. I, by myself, made the offer to him at which time he expressed interest and advised me of the conflict of interest and recommended that I seek other counsel if I wanted to sell Attorney Carlson the property.

{¶ 11} "I further asked Attorney Carlson to locate an attorney for me. He provided three names, namely [three different local attorneys] for me to contact. I then asked Attorney Carlson to call these three attorneys to see if they were interested in my case and handling the real estate sale. I further directed Attorney Carlson to schedule an appointment immediately with these attorneys. Attorney Carlson has advised me that he was able to speak to and schedule an appointment with [two of the named attorneys], but was not able to speak with [the third]. Attorney Carlson has no affiliation with these attorneys. Based upon my own investigation and knowledge, I have selected [the name of one of the recommended attorneys (this name was handwritten in the blank space provided)] to be my attorney to whom my file is to be transferred and who will handle my case from this point on.

---

1. Although the prospective purchaser apparently authorized the offer, the buyer had not signed the purchase agreement.

{¶ 12} "I am fully and completely satisfied with the good quality of representation by Attorney Carlson to date.

{¶ 13} "I, [the client], further state that I have had sufficient time to reflect and consider the sale of my property and wish to proceed with the sale as soon as possible."

{¶ 14} Later that same day, October 23, respondent took the documents to the new attorney's office, where respondent had arranged for the client to sign them, with the new attorney as a witness. The new attorney and the client met in the office parking lot while respondent waited inside. They conducted this meeting outdoors in the fresh air allegedly at the client's request because of his lack of hygiene.

{¶ 15} The new attorney did not substantively discuss or review the documents with the client but did ask the client whether he understood them. The new attorney and his secretary witnessed the client's signature, including his signature on one Authorization/Acknowledgment. The new attorney also wrote his name in the blank space on the document, which he believed was consistent with his agreement to represent the client in the health-code proceedings. The entire meeting took less than ten minutes. After the closing, the client left with a friend, and respondent recorded the deed conveying the property.

{¶ 16} Before this meeting, the client had signed the other Authorization/Acknowledgment at respondent's office. The client had filled in the blank space for the new attorney's name, and respondent and his secretary had witnessed the client's signature.

{¶ 17} Later that evening, respondent learned from the client's real estate agent about the purchase agreement that the client had signed on October 21. The real estate agent had learned of respondent's contract that afternoon from the client, who had called her fearful that he had "defrauded" his lawyer. Respondent contacted the prospective buyer's real estate agent and offered to assume and complete that purchase agreement. That realtor refused to deal with him.

{¶ 18} Within a week, the client voluntarily admitted himself and was confined to the psychiatric unit of the United States Veterans' Hospital in Brecksville, Ohio. In February 2001, the Medina County Probate Court considered expert medical evidence and found that the client was suffering from paranoid schizophrenia and was incompetent. That evidence included the examining psychiatrist's statements that the client "is not able to take care of himself or make sound decisions that are in his best interest" and "is easily influenced by others making it possible for others to take advantage of him." The probate court appointed an attorney as guardian of the client.

{¶ 19} On October 26, 2000, the attorney who had agreed to defend the client in the health-code proceedings filed a notice of substitution of counsel. He made an appearance at the first pretrial and, with the court's consent, withdrew.

{¶ 20} In December 2000, respondent offered to convey the property back to the client in exchange for the return of his $5,000 payment. However, the client's guardian and respondent were not able, for various administrative reasons, to unwind the sale until March 8, 2002. Respondent did not return the property before then, because he wanted his $5,000 down payment back. He also recouped his closing expenses.

{¶ 21} The panel concluded from this evidence that respondent violated DR 5–103(A) and 5–104(A), finding with respect to the Authorization/Acknowledgment:

{¶ 22} "The 'Authorization/Acknowledgement' documents drawn by [respondent], purport to be the statement of [his client], and [to] exculpate [respondent] from any breach of ethical duty owed to his client and [to] authorize [respondent] to withdraw as his counsel and assist [the client] in choosing a successor attorney to represent him in his pending litigation and to advise him in his anticipated sale of real estate to [respondent]. * * * The separate paragraphs of the 'Authorization/Acknowledgement' are ambiguous at best about the work to be undertaken by the successor attorney taking the pending litigation case file being handled by [respondent]. The inclusion of language or lack of inclusion of clear language concerning the obligation of the successor counsel to advise [his client] about his business dealing with [respondent] is deceptive. The panel finds that the interest protected by this document is that of [r]espondent * * *, not that of his client * * *."

{¶ 23} In recommending a sanction, the panel noted that it was unaware of any prior disciplinary measures against respondent. It also considered mitigating (1) that respondent had generally cooperated in the disciplinary process, (2) that respondent had submitted two character-reference letters describing his professional competence and reputation for honesty, integrity, and trustworthiness, and (3) that his misconduct did not extend beyond a single episode. As aggravating factors, the panel found that respondent expressed no remorse, felt that he was victimized by his client and had done nothing wrong, and regretted only that his misconduct drew adverse publicity that negatively affected his practice. Moreover, by clear and convincing evidence, the panel concluded:

{¶ 24} "Respondent acted from a selfish motive to take advantage of his client's distress to buy up a property worth much more than he paid for it and turn a quick profit that otherwise could have greatly benefited his client. He did not counsel his client but seized the opportunity to enrich himself to his client's loss by withdrawing from his professional responsibility to that client. The fact may not be ignored that the opportunity seized by Respondent arose from and

because of the subject matter for which Respondent's professional services had been retained by his client."

{¶ 25} The panel also considered as an aggravating circumstance that respondent did not convey the client's property to his guardian until after respondent received notice, on or about February 15, 2002, that relator intended to file the instant complaint. In addition, the panel found that respondent arranged to buy his client's property when the client's impaired condition and vulnerability should have been apparent. Moreover, the panel did not believe respondent's assertions that he did not know either that the property had been listed or that it had a much greater value than respondent had agreed to pay. See Guidelines for Imposing Lawyer Sanctions, Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline of the Supreme Court.

{¶ 26} The panel rejected relator's suggested sanction—disbarment—and also the sanction suggested by respondent—a public reprimand or a period of suspension, all stayed. The panel instead recommended that respondent be suspended from the practice of law for six months. The board adopted the panel's findings of misconduct and recommendation.

{¶ 27} We agree that respondent violated DR 5–103(A) and 5–104(A); however, we find this misconduct so egregious that it requires a more severe sanction than the board recommended. As cogently argued in relator's objections, respondent unabashedly arranged to buy the farm of his mentally ill client, which was the subject matter of the litigation for which the client had hired respondent, for a small fraction of its worth. Moreover, he set up the transaction to give the appearance that his client had consented after full disclosure. These acts constitute flagrant violations of DR 5–103(A) and 5–104(A).

{¶ 28} While respondent has not filed objections to the board's findings and recommendation, he nevertheless argues that his misconduct does not warrant a sanction as severe as a six-month suspension. He claims that (1) he truly believed that his actions complied with the ethical code, which he consulted before the transaction, (2) he honestly did not know the value of his client's property or that it had been listed, and (3) he genuinely thought that the attorney that he had contacted had agreed to take over the client's representation in the health-code proceedings *and* to represent the client in the sale.

{¶ 29} We find respondent's explanation for his misconduct just as incredible as the panel and board did. Respondent made no real attempt to be professionally diligent, and his attempt to cover self-dealing is manifest. In short, we simply do not believe that any duly licensed attorney could out of pure inadvertence and incompetence so completely disregard a client's interests.

{¶ 30} Respondent cites *Cincinnati Bar Assn. v. Hovey* (1997), 78 Ohio St.3d 495, 678 N.E.2d 1369, and *Disciplinary Counsel v. Baldwin* (1996), 74 Ohio St.3d 592, 660 N.E.2d 1145, in support of his assertion that a stayed suspension is a more appropriate sanction in this case. In *Hovey*, we imposed a stayed six-month suspension on an attorney who mortgaged her residence to a client in exchange for a $10,000 loan, did not relate all the details of the transaction to the client, and later failed to list the mortgage on another residential loan. And in *Baldwin*, we publicly reprimanded an attorney who purchased a financially distressed client's property at the fourth auction of the property. Neither of these attorneys, however, put their client in jeopardy of substantial financial loss. Moreover, the clients in those cases were not as vulnerable as respondent's client. In fact, after the attorney in *Baldwin* transferred the property back to his client, along with a profitable lease he had arranged, the client acknowledged that at no time had his former attorney "consciously" caused him "harm or financial detriment" by buying his property. 74 Ohio St.3d at 593, 660 N.E.2d 1145.

{¶ 31} When an attorney enters into a business transaction with a client in violation of the Code of Professional Responsibility, the closer the attorney's misconduct is to deliberate deceit and misrepresentation, the more severe the sanction it requires. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 18. See, e.g., *Toledo Bar Assn. v. Miller* (1970), 22 Ohio St.2d 7, 51 O.O.2d 4, 257 N.E.2d 376 (attorney indefinitely suspended for misrepresenting his interest in an investment that he recommended to his client and failing to disclose certain critical details); *Bar Assn. of Greater Cleveland v. Nesbitt* (1982), 69 Ohio St.2d 108, 23 O.O.3d 157, 431 N.E.2d 323 (attorney suspended for one year for failing to disclose a finder's fee that he received to arrange his clients loan to a third party); and *Dayton Bar Assn. v. Evans* (1985), 18 Ohio St.3d 300, 18 OBR 348, 480 N.E.2d 1118 (attorney indefinitely suspended for failing to disclose to the client his commissions in the purchase of privately traded stock and for other misconduct).

{¶ 32} Applying this rule to the facts of this case, it is clear that respondent's misconduct requires a sanction more severe than that recommended by the board. We therefore order that respondent be suspended from the practice of law in Ohio for two years. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

F.E. SWEENEY, J., dissents because he would suspend respondent for one year.

———————

Stephen J. Brown and Dennis E. Paul, for relator.

Lane, Alton Horst, L.L.C., and Alvin E. Mathews, for respondent.