CLEVELAND BAR ASSOCIATION *v.* GREENBERG.

[Cite as *Cleveland Bar Assn. v. Greenberg,* 112 Ohio St.3d 138, 2006-Ohio-6519.]

*Attorneys – Misconduct – Multiple disciplinary violations – 18-month suspension.*

(No. 2006-1210 — Submitted September 20, 2006 — Decided December 27, 2006.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 05-009.

_____

**Per Curiam**.

{¶ 1} Respondent, Alan D. Greenberg of Pepper Pike, Ohio, Attorney Registration No. 0011157, was admitted to the practice of law in Ohio in 1959. Respondent has been registered in retired status under Gov.Bar R. VI(3) since 2003.

{¶ 2} On February 7, 2005, relator, Cleveland Bar Association, charged respondent with three counts of professional misconduct. Respondent answered, admitting most of the facts underlying the complaint but denying that he had violated the Disciplinary Rules. A panel of the Board of Commissioners on Grievances and Discipline heard the cause, making findings of misconduct and a recommendation, which the board adopted.

Misconduct

{¶ 3} The three counts of misconduct arose from transactions involving Blue E Investment Company ("Blue E"), a small commercial loan company that respondent owns, controls, and represents. In 1998, as in previous and later years, respondent conducted Blue E business and practiced law as a sole practitioner out

of the same office, acting interchangeably as either Blue E's legal counsel or its corporate officer.  Most of Blue E's customers have been restaurants and bars.

*Counts I and II*

{¶ 4}   Beginning in 1998, respondent represented the seller in the sale of a tavern to Ray-Bons, Inc., a corporation then owned by Bonnie McCormick and Ray Villanueva, her husband.  The seller introduced respondent to McCormick and Villanueva as the tavern's attorney and someone who could "help them out." McCormick, a housewife of 30 years with no business experience, thereafter relied on respondent's advice in various business dealings with Blue E and others, thinking that he was her lawyer.

{¶ 5}   Some months after purchasing the tavern for $100,000, Ray-Bons sought to borrow $15,000 from Blue E.   To this end, on July 13, 1999, McCormick and Villanueva signed a cognovit promissory note for $21,075 as officers of Ray-Bons.[1]  The terms of the note required payments of $585 per month for 35 months and a 36th additional payment of $600, stating an interest rate of 13.5 percent per annum "after maturity or default."   McCormick and Villanueva also agreed as corporate officers to give Blue E a security interest in the tavern fixtures and liquor permit and to personally guarantee the loan. Respondent prepared the note and the papers for the security interest and personal guarantee.   Apart from respondent's legal "help" with these documents, McCormick and Villanueva were not represented by counsel in these transactions.

---

[1]   The holder of a cognovit in default obtains a " 'judgment without a trial of possible defenses which the signers of the notes might assert' " because "the debtor consents in advance to the holder's obtaining a judgment without notice or hearing."  *D.H. Overmyer Co., Inc. v. Frick Co.* (1972), 405 U.S. 174, 176-177, 92 S.Ct. 775, 31 L.Ed.2d 124, quoting *Hadden v. Rumsey Products, Inc.* (C.A.2, 1952), 196 F.2d 92, 96.   "An attorney, whom the note holder may designate, appears on behalf of the debtor and, pursuant to provisions of the cognovit note, confesses judgment and waives the debtor's right to notice of the proceedings.  See *Medina Supply Co. v. Corrado* (1996), 116 Ohio App.3d 847, 850 [689 N.E.2d 600]; *Overmyer* at 176 [92 S.Ct. 775, 31 L.Ed.2d 124]."  *Simmons Capital Advisors, Ltd. v. Kendall Group, Ltd.*, Franklin App. No. 05AP-1087, 2006-Ohio-2272, 2006 WL 1230673.

**{¶ 6}** On August 16, 1999, Ray-Bons made a first payment of $586, three days late, to Blue E on the promissory note. On September 1, 1999, Villanueva personally borrowed $800 more from Blue E, although he did not sign another note. Ray-Bons failed to make its September 1999 payment on the note, and shortly afterward, the tavern closed.

**{¶ 7}** On October 4, 1999, about three months after the $15,000 loan, respondent filed a complaint on behalf of Blue E to collect on the Ray-Bons cognovit note. His complaint prayed for judgment in the amount of $21,289, plus ten percent interest per annum beginning on October 4, 1999, against Ray-Bons, McCormick, and Villanueva. The $21,289 prayer for relief represented the total due on the note, i.e., $21,075 (without any rebate of unearned interest), plus the $800 personal loan to Villanueva, less Ray-Bons's single $586 payment on the loan.

**{¶ 8}** At the disciplinary hearing, attorney George Argie, whom McCormick eventually retained to represent her, claimed that respondent had defrauded the court in obtaining judgment on the cognovit note. He testified that respondent had overcharged for interest and had improperly included the $800 personal loan to Villanueva in his prayer for relief. In Argie's view, respondent had thereby misrepresented in his complaint the amount to which he was entitled on default of the cognovit note.

**{¶ 9}** Respondent maintained that the cognovit note did not charge excessive interest. The $6,075 amount, he claimed, was not "interest"; rather, it was a premium charged for lending in connection with a high-risk venture. Thus, respondent claimed, when Ray-Bons defaulted, the entire amount of the note, or $21,075, became due, even though the three-year loan had been outstanding for less than three months. And because the loan was business-to-business rather than business-to-consumer, the parties were free to negotiate their own premium according to their own judgment.

**{¶ 10}** Respondent further asserted that the 13.5 percent interest rate specified in the cognovit note applied only to the balance after taking judgment; it did not apply in calculating interest during the actual life of the loan. According to respondent, the terms of the loan were in fact fairly standard between corporate parties of equal bargaining power transacting commercial business, especially involving the high-risk purchase and operation of a bar.

**{¶ 11}** In adopting the panel's report, the board accepted respondent's explanation of the Ray-Bons $15,000 loan. As to the unpaid $800 personal loan to Villanueva that respondent had wrapped into the Ray-Bons judgment, however, the board found that it was a consumer loan subject to the statutory restrictions on those transactions. One such restriction is that the lending institution be licensed by the state, which Blue E was not.

**{¶ 12}** After obtaining the judgment against Ray-Bons, McCormick, and Villanueva, respondent took no further action to collect for over two years. McCormick and Villanueva divorced in those years, and McCormick succeeded to Villanueva's interest in Ray-Bons. Respondent continued to act as Blue E's counsel and also gave legal advice to McCormick regarding her personal concerns and Ray-Bons's corporate interests, including acting as their representative before the Ohio Liquor Commission. At no time did respondent suggest that McCormick or Ray-Bons retain independent counsel.

**{¶ 13}** In November 1999, respondent learned that the tavern would lose its liquor license unless Ray-Bons applied for authority from the state to temporarily close the establishment. Respondent prepared the application for Ray-Bons, had McCormick sign it, and filed the application with the state. Respondent's advice to McCormick was designed to protect Blue E's security interest in the liquor license, although he claimed that his advice was in both their interests.

{¶ 14} In early 2000, a buyer for Ray-Bons's tavern came forward. Respondent drafted papers for the prospective purchase, for which Blue E again arranged financing. The buyer's attorney drafted an interim management agreement providing for loan payments of $683 per month. All parties signed the management agreement. McCormick testified that when she signed, she was still under the impression that respondent was her lawyer.

{¶ 15} Under the management agreement, the buyer agreed to direct its payments to Blue E rather than Ray-Bons, and Blue E was to apply these payments to reduce Ray-Bons' debt to Blue E. The buyer eventually defaulted, by which time Blue E had received $10,745. From this amount, Blue E applied $4,951.50 to retiring the Ray-Bons judgment debt and retained $5,739.50 as reimbursement for various payments made on behalf of Ray-Bons.

{¶ 16} On October 18, 2001, respondent appealed the denial of the application to renew Ray-Bons' liquor permit. Before the Ohio Liquor Control Commission, respondent identified himself as Ray-Bons' attorney. He did not tell McCormick of the appeal.

{¶ 17} McCormick eventually retained Argie, who attempted to get relief from the cognovit judgment pursuant to Civ.R. 60(B). Argie was not successful.

{¶ 18} At the disciplinary hearing, respondent denied any misrepresentation or conflict of interest in his dealings with Ray-Bons, McCormick, and Villanueva, insisting that his actions were necessary to protect Blue E's security interest in the tavern's liquor license. The board, however, found that by knowingly and improperly obtaining a judgment on the $800 personal loan, with interest, and by rolling it into a complaint for judgment on the cognovit note, respondent had violated DR 1-102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), 1-102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice), and 1-102(A)(6) (prohibiting conduct that adversely reflects on the lawyer's fitness to

practice law), as charged in Count I. As to Count II, the board found that respondent had committed additional violations of DR 1-102(A)(4) by (1) continuing to advise McCormick as to her legal interests and those of Ray-Bons while at the same time acting to protect his own and Blue E's financial interest in Ray-Bons' property and (2) misrepresenting himself as McCormick's attorney to a public agency in pursuit of his own and Blue E's financial interest.

*Count III*

{¶ 19} In December 2001, while respondent's motion to appoint a receiver for Ray-Bons was pending, Al Molnar attempted to purchase Ray-Bons' tavern in the name of his uncle. Molnar, a convicted felon, was legally barred from holding a liquor permit in his own name. With his uncle's power of attorney and a check for $5,000, Molnar met with respondent about the prospective purchase.

{¶ 20} Respondent's role in this transaction also shifted between representing himself and Molnar or his uncle. By 2001, Argie was representing Ray-Bons as the seller, and he recalled Molnar's saying that respondent was representing him. In fact, Argie advised respondent in writing that Molnar considered respondent his counsel. Respondent admitted that he and Molnar had met in December 2001 and that he had drafted a purchase agreement and financial documents naming Molnar's uncle and Ray-Bons as parties to the sale of Ray-Bons' tavern. He denied, however, that he represented Molnar or his uncle in the transaction.

{¶ 21} The purchase agreement, which was never fully executed, provided for a total selling price of $40,000, with a $5,000 down payment to be paid respondent and Argie in escrow. Molnar signed the purchase agreement for his uncle and gave respondent a $5,000 check with the payee line left blank. Respondent then filled in his and Argie's names as payees and forwarded the proposed purchase agreement and a copy of the check to Argie.

{¶ 22} On January 3, 2002, fearful that the check might bounce, respondent signed both his name and Argie's on the check and deposited it into his own office trust account. Respondent did not have Argie's authority to sign on his behalf or to negotiate Molnar's check.

{¶ 23} In February 2002, respondent told Argie what he had done, and Argie immediately advised respondent in writing that respondent had no authority to endorse the check for him. Despite his denials that he had ever represented Molnar or his uncle, respondent wrote a statement purporting to grant Argie "authority" to speak to Molnar's uncle directly, i.e., without respondent's involvement. Argie then redrafted the purchase agreement, obtained Molnar's and McCormick's signatures, and forwarded it to respondent.

{¶ 24} This second purchase agreement designated Argie as the sole escrow agent. As such, Argie demanded that respondent forward the $5,000 down payment to him. Respondent did not reply, nor did he respond to Argie's numerous subsequent demands for return of the $5,000.

{¶ 25} Respondent eventually agreed to return the $5,000 payment to Argie after McCormick filed her grievance. Argie applied the money to his legal fees with McCormick's permission, although the money may have actually belonged to Molnar because the Ray-Bons tavern purchase was never completed. The bar and its liquor license were ultimately sold by a court-appointed receiver, and over $13,000 of the proceeds of that sale was applied to satisfy respondent's judgment against Ray-Bons.

{¶ 26} Because respondent had endorsed Argie's name without authority and failed to remit the $5,000 check in accordance with the terms of the purchase agreement, the board found that respondent had violated DR 1-102(A)(3) (prohibiting illegal conduct involving moral turpitude) and 1-102(A)(6).

Recommended Sanction

**{¶ 27}** In recommending a sanction for this misconduct, the board weighed the aggravating and mitigating factors of respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

**{¶ 28}** Favoring a severe sanction, the board found that all of respondent's misconduct resulted from his determination to profit from the Blue E loan to Ray-Bons. The board thus concluded that respondent had acted out of self-interest, an aggravating factor under BCGD Proc.Reg. 10(B)(2)(b). The board further found that respondent had harmed a vulnerable victim by taking advantage of McCormick's lack of sophistication. BCGD Proc.Reg. 10(B)(1)(h). As an example, the board cited the fact that respondent had not updated credit information for Ray-Bons and McCormick to show repayment of at least $16,000 of the original $21,000 cognovit judgment, a lapse that has helped ruin McCormick's credit.

**{¶ 29}** The board also found in aggravation that respondent had engaged in a pattern of misconduct and multiple offenses. BCGD Proc.Reg. 10(B)(1)(c) and (d). In doing business with McCormick and Molnar, respondent created conflicts of interest while loosely "representing" one or both of them, all the while acting in Blue E's and his own interest. In particular, respondent either led McCormick to rely on his advice or did not advise her to seek independent counsel when she clearly considered him to be her attorney. Molnar was also under the impression that respondent represented him.

**{¶ 30}** In addition, the board determined that respondent's testimony was at times so inconsistent and contradictory that some of his statements must have been false. The board thus found that respondent had submitted false evidence, an aggravating factor under BCGD Proc.Reg. 10(B)(1)(f). Respondent also refused to acknowledge his wrongdoing. BCGD Proc.Reg. 10(B)(1)(g). Even

8

after purporting in writing to represent McCormick and Ray-Bons before the Liquor Control Commission and admittedly exercising no duty of care or loyalty, respondent still denied that he was ever their lawyer or that he had failed McCormick and her company in any way.

{¶ 31} In mitigation, the board determined that respondent had no prior disciplinary record. BCGD Proc.Reg. 10(B)(2)(a). Also, respondent generally cooperated during the disciplinary proceedings. BCGD Proc.Reg. 10(B)(2)(d). Finally, the board found that aside from the instant events, respondent enjoyed a reputation for good character in the community.

{¶ 32} Relator suggested that respondent be indefinitely suspended from the practice of law, with the suspension to commence at such time as respondent requests reinstatement to the active practice of law, if he ever does. As an alternative, relator proposed that respondent serve an 18-month suspension, again with the suspension to commence when and if respondent resumes active practice. Respondent advocated dismissal of the complaint or, in the alternative, a public reprimand, citing the facts that he is retired and has closed his practice.

{¶ 33} Adopting the panel's report, the board listed three instances in which respondent acted with outright dishonesty. He falsely endorsed a check, he misrepresented himself as the lawyer for the holder of a liquor license, and he falsely took a judgment on Villanueva's $800 personal loan. All prejudiced the administration of justice and reflected poorly on respondent's fitness to practice law. These violations and an absence of significant mitigating circumstances, as the board observed, have warranted a lawyer's permanent disbarment. *Disciplinary Counsel v. Sagen* (1991), 61 Ohio St.3d 62, 572 N.E.2d 658.

{¶ 34} In making its recommendation of a sanction, the board considered the fact that respondent might choose to leave retirement and return to active status at any time. It also considered the gravity of his misconduct and the need to protect the public, balanced against his prior unblemished record and his

reputation for good character. Taking all these factors into account, the board recommended that respondent be suspended from the practice of law for 18 months. The board also recommended that the suspension commence on the date that respondent resumes active status, if he ever seeks to do so.

Review

{¶ 35} We agree that respondent violated DR 1-102(A)(3), (4), (5), and (6), as found by the board. We also agree that the recommended 18-month suspension is appropriate.

{¶ 36} This case is similar to another instance in which a seasoned lawyer insisted on advancing his own interests at the expense of clients and others, losing sight of how his disloyalty breached professional duties. In his first disciplinary proceeding, we suspended the lawyer's license to practice for two years, staying the last 18 months, for his unchecked conflicts of interest with clients, citing his previously unblemished career. *Akron Bar Assn. v. Holder,* 102 Ohio St.3d 307, 2004-Ohio-2835, 810 N.E.2d 426. Later, we indefinitely suspended the same lawyer's license for further incidents of multiple representation, especially his indifference to the attendant risks of compromising some clients' interests while protecting others. *Akron Bar Assn. v. Holder,* 105 Ohio St.3d 443, 2005-Ohio-2695, 828 N.E.2d 621. That lawyer eventually also retired and later submitted his resignation in hopes of avoiding disbarment in his third disciplinary case. We rejected his offered resignation and ordered his disbarment. *Akron Bar Assn. v. Holder*, 112 Ohio St.3d 90, 2006-Ohio-6506, 858 N.E.2d 356.

{¶ 37} Respondent does not object to the board's findings of misconduct or recommendation, and an intermediate suspension period — even though respondent has retired — is in the public's interest. Respondent is therefore suspended from the practice of law in Ohio for a period of 18 months. The suspension shall commence on the date that respondent applies to resume active status, if that ever occurs. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

_____

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 38} I concur in the opinion and judgment of the majority, except that I would begin the 18-month suspension now rather than waiting for respondent to apply to resume active status, if that ever occurs. I know of no precedent in this court for a similar delay in imposing discipline.

{¶ 39} If the argument is that we should still enforce discipline despite respondent's retired status because he may apply to resume active status at any time, then it makes more sense to enforce the discipline now. That gives respondent an opportunity to reapply for active status at the expiration of the 18-month suspension, since other than this incident, he has had no discipline and otherwise has a good reputation in the community. The fact that respondent chooses to be retired at this time seems irrelevant. Delaying discipline seems to make the penalty even harsher.

{¶ 40} Accordingly, I respectfully dissent as to the delay in the imposition of respondent's suspension and would begin the 18-month suspension immediately.

_____

Cathleen M. Bolek and Todd J. Andersen, for relator.

Richard S. Koblentz and Bryan L. Penvose, for respondent.

_____