**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Jarvis*, **Slip Opinion No. 2022-Ohio-3936.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3936

DISCIPLINARY COUNSEL *v*. JARVIS.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Jarvis*, Slip Opinion No. 2022-Ohio-3936.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including failing to act with reasonable diligence in representing a client, failing to reasonably consult with a client about the means by which the client's objectives are to be accomplished, failing to maintain a normal lawyer-client relationship with a client when the client's capacity to make considered decisions is diminished, and engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation—Eighteen-month suspension stayed on conditions.*

(No. 2022-0366—Submitted May 24, 2022—Decided November 8, 2022.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2021-020.

_____

**Per Curiam.**

{¶ 1} Respondent, Timothy Paul Jarvis, of Lancaster, Ohio, Attorney Registration No. 0076067, was admitted to the practice of law in Ohio in 2003. In an August 2021 complaint, relator, disciplinary counsel, charged Jarvis with seven ethical violations arising from the representation of a married couple and their trustee in an estate-planning matter. Relator alleged that Jarvis had neglected his clients' legal matter, failed to communicate with his clients about their wishes, and failed to assess one client's testamentary capacity, falsely notarized various estate-planning documents, instructed his employee to falsely indicate that she had witnessed documents, and failed to promptly deliver their file upon the termination of his representation.

{¶ 2} The parties entered into stipulations of fact, misconduct, and aggravating and mitigating factors. After a hearing conducted by a three-member panel of the Board of Professional Conduct, the board issued a report finding that Jarvis committed six stipulated rule violations and unanimously dismissing a seventh alleged violation. The board adopted the parties' stipulated aggravating and mitigating factors and recommended that Jarvis be suspended from the practice of law for one year, stayed in its entirety on the conditions that he commit no further misconduct and make restitution of $7,500 within 30 days of the date of our final order. No objections have been filed.

{¶ 3} We adopt the board's findings of misconduct, but for the reasons that follow, we find that a greater sanction is warranted. We therefore suspend Jarvis from the practice of law for 18 months with the entire suspension stayed on the conditions recommended by the board.

## Misconduct

{¶ 4} Frank A. and Lenor W. Balcar (jointly, "the Balcars"), were married in 1941. They had five children—Bruce, Paul, Karen, Mark, and Barbara.

**{¶ 5}** Frank suffered a massive and debilitating stroke in February 2010 and subsequently lived in a nursing home. In May of that year, Lenor and Karen contacted Jarvis's law firm, Jarvis Law Office, about preserving and protecting the Balcars' assets from being depleted by the costs of Frank's care. They met with Melissa Evick, a nonattorney who, at that time, served as Jarvis's office manager. Lenor and Karen gave Evick basic information regarding the Balcars and their assets. They also informed her that Frank was 94 years old and in poor health. Evick conveyed the information to Jarvis by email later that day.

**{¶ 6}** On May 28, Jarvis met with Lenor and Karen. He told them that he could create an irrevocable trust that would protect the Balcars' assets and that he would then apply for Medicaid on Frank's behalf. Jarvis told Lenor and Karen that he could save them between $95,000 and $110,000 if they retained him. Jarvis was aware that even if Frank qualified for Medicaid, his family would still have to pay for at least 16 months of his care due to a Medicaid "lookback" or "penalty" period. But Jarvis has stipulated that if Karen were called to testify, she would state that he did not advise them about the lookback period other than to tell them that it was "very short."

**{¶ 7}** After advising Jarvis about Frank's health conditions—including a diagnosis of Alzheimer's disease—Lenor and Karen specifically asked if Frank was competent to sign legal documents. Jarvis has stipulated that Karen would testify that he advised her and Lenor that (1) Frank's capacity would not be an issue and (2) Frank only needed to be able to place an "X" on the appropriate lines of the documents. Although Karen emailed additional questions to Jarvis, he refused to respond, claiming, "I've learned the hard way that if I 'give away' all of my secrets prior to being retained, I run the risk of someone thinking that they can do this themselves."

**{¶ 8}** In June, Karen paid Jarvis $7,500 to represent them. Although Jarvis did not enter into a written fee agreement detailing the scope of the representation,

based on their communications, Karen believed that he would draft updated estate documents for the Balcars, transfer the Balcars' nonmonetary assets into an irrevocable trust, and if necessary, probate the Balcars' estates. Karen and Barbara provided Evick with documentation regarding the Balcars' assets to facilitate the transfer of those assets into the irrevocable trust.

*Drafting of Estate-Planning Documents*

{¶ 9} Jarvis drafted the Balcar Family Irrevocable Trust and a certification of trust. Consistent with an earlier revocable trust that had been created by Lenor and the amendments to it, the irrevocable trust (1) designated Karen as the trustee, (2) provided that upon the deaths of Frank and Lenor, 10 percent of the trust assets would be distributed to a faith-based organization, and (3) provided that there would be no distribution to Paul other than a watch that had belonged to Frank. In contrast to the earlier revocable trust, which had provided that Barbara would receive a larger percentage of the remaining trust assets, the irrevocable trust provided that those assets would be split equally among Bruce, Karen, Mark, and Barbara.

{¶ 10} In addition, Jarvis drafted other estate-planning documents, including wills and durable powers of attorney.

*False Signing and Notarization*

{¶ 11} On June 25, Evick met with Frank at the nursing home where he resided and had him sign the durable power of attorney. On June 28, Evick and another employee of Jarvis's firm met with Frank and had him sign a second copy of that document.

{¶ 12} Although Jarvis met with Lenor, he never personally communicated with Frank and therefore never (1) explained the purpose of the estate-planning documents, (2) ascertained whether Frank wanted to execute the documents, or (3) determined whether Frank had the testamentary or contractual capacity to sign them. Nor was Jarvis present when Frank signed the durable powers of attorney.

However, Jarvis signed the first durable power of attorney as a witness and falsely notarized both versions under jurats stating that Frank had personally appeared before him and voluntarily signed the instrument.

{¶ 13} On August 11, a doctor examined Frank and noted, "Frank does not communicate when asked questions, he looks at you but is not able to answer questions." The following day, Lenor and Karen met with Jarvis to review and sign the estate documents. Lenor signed the irrevocable-trust agreement and other estate-planning documents in Jarvis's presence. Karen signed the agreement as the trustee. Evick signed Lenor's will and durable power of attorney as a witness. Jarvis stipulated, however, that if Evick were called to testify, she would state that she was either called into the meeting after the documents were signed or that she signed them as a witness sometime after Lenor and Karen left—a common practice in Jarvis's office at that time.

{¶ 14} Even though Jarvis knew that Evick was not an Ohio notary, he directed her to meet with Frank at his nursing home on August 13 or 14 to have him sign the irrevocable trust and four other estate-planning documents. Jarvis did not discuss those documents with Frank or assess Frank's testamentary or contractual capacity *before* Frank signed them. Nor was he present when Frank signed them. But several days after Evick obtained Frank's signature on those five documents, Jarvis backdated and notarized all of them under jurats that falsely stated that Frank had personally appeared before him to acknowledge his signature. He also falsely signed Frank's will as a witness and attested on two of the documents that Frank appeared to be of sound mind when he signed them.

*Conduct after the Estate-Planning Documents Were Executed and after the Balcars' Deaths*

{¶ 15} At the end of September, Evick applied for Medicaid on Frank's behalf. Although almost seven weeks had elapsed since Frank signed the trust agreement and the other estate-planning documents, the only asset that had been

transferred to the irrevocable trust was a checking account belonging to Lenor. By the end of October, the Department of Job and Family Services had determined that the application was incomplete and had requested additional information regarding Frank's assets.

{¶ 16} Frank died on November 6, 2010, without qualifying for or receiving any Medicaid benefits. Because most of his assets had not been transferred into the irrevocable trust, they were subject to probate costs and estate taxes.

{¶ 17} In April 2011, Lenor signed a fiduciary deed to transfer her home from the revocable trust to the irrevocable trust. Jarvis notarized the deed under a jurat falsely stating that Lenor had personally appeared before him to acknowledge the signature. The deed was recorded on May 4, 2011—Lenor died nine days later.

{¶ 18} Jarvis continued to represent Karen as trustee of the irrevocable trust and executor of the Balcars' estates. Karen and Barbara continued to correspond with Evick and provide her with documents related to the estates and the trust. Karen believed that Jarvis would send a letter to the trust's beneficiaries informing them of the trust's existence and how it would affect them—but he never did.

{¶ 19} By July 2011, the Balcars' son Bruce had learned that the irrevocable trust existed. He engaged counsel, who wrote a letter to Karen requesting a copy of the irrevocable trust and an inventory of the trust assets. Karen forwarded that letter to Evick, who stated that Jarvis would respond to it. As a trustee, Karen had a statutory obligation to keep the beneficiaries reasonably informed about the administration of the trust and to promptly respond to a beneficiary's request for information. *See* R.C. 5808.13(A). Notwithstanding that obligation, Jarvis did not respond to the request for information that Karen had received from Bruce's attorney or to a subsequent request that the attorney sent directly to him.

{¶ 20} Paul, another of the Balcars' sons, met with Evick in early August and requested a copy of the irrevocable trust. Evick declined to give him a copy of

the trust agreement but read to him the portions of the trust related to his distribution and Frank's watch. Paul left the meeting upset.

{¶ 21} Evick notified Karen about her meeting with Paul and emailed Karen a copy of the letter that Bruce's counsel had sent to Jarvis. Karen responded to that email and demanded a date that the information would be sent to Bruce's counsel. She also expressed displeasure that Jarvis had not responded to the attorney's first letter, stating, "Had the original letters been sent two weeks after my mother's death as I was expecting most of this would have been avoided." Jarvis responded with an email informing Karen that the letter to Bruce's counsel would go out when he completed it and threatening to terminate the representation if Karen did not abide by his rules.

{¶ 22} By the end of August 2011, Paul's counsel had also written to Jarvis to request complete copies of any trust instruments, all beneficiary reports or updates, the name of the trustee, and the trustee's compensation rate. In an October 5 email, Jarvis informed Karen that he had received a second letter from Paul's counsel and—for the first time—told her that she was required to provide a copy of the irrevocable trust to the trust beneficiaries. Although Jarvis stated that he would provide a copy of the trust to Paul's counsel, he never responded to either attorney's inquiries.

{¶ 23} Jarvis's October 5 email to Karen also stated that because Bruce and Paul had engaged counsel, "it seems fairly likely that [they would] end up in litigation." For that reason, Jarvis asserted that he could no longer represent the estates of Frank and Lenor and withdrew from the representation. That day, Karen instructed Jarvis to send information regarding the irrevocable trust to her new attorney. Despite having received that email and a follow-up email from Karen, Jarvis did not forward the requested information.

{¶ 24} Later that month, Paul filed a complaint against Karen in the Belmont County Probate Court alleging that she had failed to notify him of the trust

or keep him apprised of trust assets as required by law. He further alleged that she had used undue influence, coercion, or other means to persuade Frank and Lenor to revise their estate plan. Bruce sought and was granted leave to intervene in the proceeding. In July 2012, Karen's counsel asked Jarvis turn over the original file to him by July 16. On August 10—ten months after he had withdrawn from the representation—Jarvis finally produced a copy of the case file. Although the Balcar siblings entered into a settlement agreement in August 2013, the probate litigation continued for another five years.

*Malpractice Litigation*

{¶ 25} In October 2012, Karen filed a legal-malpractice action against Jarvis in the Franklin County Court of Common Pleas. Following a ten-day trial in March 2019, a jury found Jarvis liable for legal malpractice and awarded Karen compensatory damages and punitive damages. In response to the parties' posttrial motions, the court reduced the punitive damages to zero and awarded Karen approximately 40 percent of her claimed attorney fees.

{¶ 26} The parties appealed the trial court's judgment. In February 2021, the court of appeals affirmed the trial court's rulings in part, reversed them in part, and remanded the case for further proceedings. *See McGraw v. Jarvis*, 2021-Ohio-522, 168 N.E.3d 163 (10th Dist.). The parties have now settled, and that litigation has been dismissed.

*Findings of Misconduct*

{¶ 27} The parties stipulated and the board found that Jarvis's conduct violated Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client), 1.4(a)(2) (requiring a lawyer to reasonably consult with the client about the means by which the client's objectives are to be accomplished), 1.14(a) (requiring a lawyer, as far as reasonably possible, to maintain a normal lawyer-client relationship with the client when the client's capacity to make adequately considered decisions in connection with a representation is diminished

due to mental impairment), 1.16(d) (requiring a lawyer to promptly deliver client papers and property as part of the termination of representation), 5.3 (requiring a lawyer possessing managerial authority in a law firm to make reasonable efforts to ensure that the conduct of nonattorneys working for the firm is compatible with the professional obligations of the lawyer), and 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

{¶ 28} We adopt these findings of misconduct.

### Recommended Sanction

{¶ 29} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 30} The parties stipulated and the board found that three aggravating factors are present—Jarvis engaged in a pattern of misconduct, committed multiple offenses, and caused harm to vulnerable victims. *See* Gov.Bar R. V(13)(B)(3), (4), and (8).

{¶ 31} As for mitigating factors, the board found that Jarvis has no prior discipline, made full and free disclosure to the board and exhibited a cooperative attitude toward the disciplinary proceedings, and had other penalties or sanctions imposed by virtue of the malpractice action and its anticipated damage award. *See* Gov.Bar R. V(13)(C)(1), (4), and (6). The board noted that Jarvis had agreed to refund the entire fee that Karen paid on behalf of the Balcars, even though he had provided some legal services to them, but that he had not made that payment by the time of his disciplinary hearing. Because no final order had issued regarding any damages occasioned by Jarvis's legal malpractice, the board declined to recommend that Jarvis be required to make any restitution beyond the refund of the Balcars' legal fee. At his disciplinary hearing, Jarvis accepted full responsibility for his misconduct. He freely acknowledged that he had "completely

misunderstood" the rules governing the notarization of documents and stated that he came to understand the correct procedures shortly after Karen filed the malpractice action against him in October 2012. He explained that he now requires the notary and witnesses to be present with the person signing documents. The board found that Jarvis's remorse was genuine and noted that the procedures he instituted in response to the malpractice action filed against him have guarded against further incidents of misconduct over the last decade.

**{¶ 32}** In considering the appropriate sanction for Jarvis's misconduct, the board was guided by the principle that the primary purpose of disciplinary sanctions is to protect the public rather than punish the offender. *See, e.g.*, *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53.

**{¶ 33}** The parties suggested that a conditionally stayed two-year suspension is the appropriate sanction for Jarvis's misconduct, but the board concluded that the parties had offered no credible precedent or other justification for that sanction. After considering the sanctions we have imposed on other attorneys who engaged in similar acts of misconduct—including the false notarization of documents, the failure to properly supervise the conduct of nonattorney employees, the neglect of client matters, and the failure to reasonably communicate with clients—the board recommended that we suspend Jarvis for one year and stay the entire suspension on the conditions that he commit no further misconduct and make restitution of the Balcars' entire $7,500 fee.

**{¶ 34}** This court has held that generally, attorney misconduct "involving dishonesty, fraud, deceit, or misrepresentation warrants an actual suspension from the practice of law." *Disciplinary Counsel v. Karris*, 129 Ohio St.3d 499, 2011-Ohio-4243, 954 N.E.2d 118, ¶ 16, citing *Disciplinary Counsel v. Kraemer*, 126 Ohio St.3d 163, 2010-Ohio-3300, 931 N.E.2d 571, ¶ 13, and *Disciplinary Counsel v. Fowerbaugh,* 74 Ohio St.3d 187, 658 N.E.2d 237 (1995), syllabus. However, we have stated that an exception to this rule may be justified when "an abundance of

mitigating evidence" is shown. *Disciplinary Counsel v. Markijohn*, 99 Ohio St.489, 2003-Ohio-4129, 794 N.E.2d 24, ¶ 8, citing *Dayton Bar Assn. v. Kinney*, 89 Ohio St.3d 77, 728 N.E.2d 1052 (2000).

{¶ 35} We have previously imposed six-month conditionally stayed suspensions on attorneys who, like Jarvis, have engaged in dishonest conduct by falsely notarizing multiple documents. *See Disciplinary Counsel v. Roberts*, 117 Ohio St.3d 99, 2008-Ohio-505, 881 N.E.2d 1236, ¶ 19 (in light of the respondent's "contrition, heretofore unblemished record, and good, albeit misguided, intentions, we do not require an actual suspension"); *Disciplinary Counsel v. Clark*, 154 Ohio St.3d 349, 2018-Ohio-4491, 114 N.E.3d 201 (implicitly finding that mitigating evidence consisting of the respondent's resignation from his law firm, his self-reporting of his misconduct to the relator, and his expression of sincere remorse justified the imposition of a fully stayed suspension).

{¶ 36} Similarly, in *Columbus Bar Assn. v. Christensen and Kluesener*, 159 Ohio St.3d 374, 2020-Ohio-167, 151 N.E.3d 552, we imposed a one-year conditionally stayed suspension on an attorney who issued six invalid subpoenas seeking information about personal-injury matters before filing suit and directed a nonattorney assistant to engage in the same type of misconduct. Like Jarvis, Kluesener failed to take reasonable efforts to ensure that his nonattorney employee's actions were compatible with his professional obligations when he instructed the employee to follow up on one of the invalid subpoenas. Kluesener also failed to take reasonable remedial action after receiving a complaint regarding the paralegal's conduct, but he was not charged with dishonest conduct.

{¶ 37} In *Lorain Cty. Bar Assn. v. Nelson*, 144 Ohio St.3d 414, 2015-Ohio-4337, 44 N.E.3d 268, we publicly reprimanded an attorney who neglected a client's legal matter, failed to reasonably communicate with the client, and failed to deliver the client's file at the termination of the representation. And in *Disciplinary Counsel v. Farris*, 157 Ohio St.3d 527, 2019-Ohio-4810, 138 N.E.3d 1134, we

imposed a one-year conditionally stayed suspension on an attorney who missed two statutory deadlines in his client's property-tax matters and lied to his clients for more than a year to conceal his neglect—though he ultimately consented to a $95,000 judgment in the malpractice case filed by one of his clients.

{¶ 38} Like Jarvis, Nelson and Farris had no prior discipline, accepted responsibility for their misconduct, and received no benefit for their misdeeds. But neither Nelson nor Farris engaged in a pattern of misconduct—let alone one comparable to Jarvis's pattern of fraudulently notarizing documents. Nor is there any suggestion that either of those attorneys failed to reasonably communicate with a client of diminished capacity.

{¶ 39} Jarvis, on the other hand, made no effort to establish or maintain a normal client-lawyer relationship with a client whose capacity was known to be diminished. Jarvis never met with Frank to assess his capacity or ascertain his wishes for his end-of-life care and the disposition of his estate before preparing the necessary documents. Instead, he drafted the documents pursuant to the instructions of Frank's family members. Jarvis directed his employee to obtain the client's signature on those documents outside of his presence and then fraudulently notarized them under jurats falsely stating that Frank had personally appeared before him and voluntarily signed the instrument. Jarvis further attested that Frank appeared to be of sound mind when he signed two of those documents—even though he was not present when those documents were signed and had no personal knowledge of Frank's mental status. Jarvis's multiple failures opened the door to allegations that Frank and Lenor had been unduly influenced or coerced to modify their estate plan, which led to another six years of estate litigation and more than ten years of malpractice litigation.

{¶ 40} Based upon the foregoing, we find that the totality of Jarvis's misconduct warrants the imposition of a sanction more stringent than the fully stayed one-year suspension recommended by the board. Nevertheless, we conclude

that the mitigating factors present in this case are sufficient to rebut the presumption that Jarvis's dishonesty requires an actual suspension from the practice of law. We believe that an 18-month suspension, stayed in its entirety on the conditions recommended by the board, is the appropriate sanction in this case.

## Conclusion

{¶ 41} Accordingly, Timothy Paul Jarvis is suspended from the practice of law in Ohio for 18 months with the suspension stayed in its entirety on the conditions that he commit no further misconduct and make restitution of $7,500 to Karen Balcar McGraw, as trustee of the Lenor W. Balcar Revocable Living Trust, within 30 days of the date of our final order. If Jarvis fails to comply with any condition of the stay, the stay will be lifted and he will serve the full 18-month suspension. Costs are taxed to Jarvis.

Judgment accordingly.

O'CONNOR, C.J., and FISCHER, DONNELLY, and BRUNNER, JJ., concur.

DEWINE and STEWART, JJ., concur in judgment only.

KENNEDY, J., dissents, with an opinion.

_____

**KENNEDY, J., dissenting.**

{¶ 42} As the majority recognizes, generally, attorney misconduct "involving dishonesty, fraud, deceit, or misrepresentation warrants an actual suspension from the practice of law." *Disciplinary Counsel v. Karris*, 129 Ohio St.3d 499, 2011-Ohio-4243, 954 N.E.2d 118, ¶ 16, citing *Disciplinary Counsel v. Kraemer*, 126 Ohio St.3d 163, 2010-Ohio-3300, 931 N.E.2d 571, ¶ 13, and *Disciplinary Counsel v. Fowerbaugh,* 74 Ohio St.3d 187, 658 N.E.2d 237 (1995), syllabus. Respondent, Timothy Paul Jarvis, committed numerous acts of dishonesty during his representation of Frank A. and Lenor W. Balcar. However, the majority finds that the mitigating factors in favor of Jarvis warrant deviation

from the general rule. Because I do not believe that the mitigating factors are significant enough to warrant deviation from the general rule, I dissent.

{¶ 43} On three occasions, Jarvis's office manager, Melissa Evick, obtained signatures from Frank on numerous estate-planning documents. However, Jarvis was not present at any of the times Frank signed the documents and had not assessed Frank's testamentary or contractual capacity. Jarvis falsely notarized seven documents despite the jurats stating that Frank had personally appeared before him. He backdated five of the documents. Jarvis also signed two documents, one of which was Frank's will, as a witness. And Jarvis attested on two of the documents that Frank appeared to be of sound mind when he signed them, despite having never assessed Frank's testamentary or contractual capacity.

{¶ 44} Jarvis also directed Evick to sign Lenor's will and durable power of attorney as a witness after Lenor had already signed the documents outside of Evick's presence. He later notarized a fiduciary deed to transfer Lenor's home under a jurat falsely stating that Lenor had personally appeared before him to acknowledge the signature.

{¶ 45} Prof.Cond.R. 8.4(c) prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. Here, Jarvis violated this rule by committing multiple acts of dishonesty during his representation of Frank and Lenor.

{¶ 46} We have held that an attorney who engages in conduct involving dishonesty, fraud, deceit, or misrepresentation generally will serve an actual suspension from the practice of law. *Karris*, 129 Ohio St.3d 499, 2011-Ohio-4243, 954 N.E.2d 118, at ¶ 16, citing *Kraemer*, 126 Ohio St.3d 163, 2010-Ohio-3300, 931 N.E.2d 571, at ¶ 13, and *Fowerbaugh*, 74 Ohio St.3d 187, 658 N.E.2d 237, at syllabus. We have explained:

A lawyer who engages in a material misrepresentation to a court or a pattern of dishonesty with a client violates, at a minimum, the lawyer's oath of office that he or she will not "knowingly * * * employ or countenance any * * * deception, falsehood, or fraud." Gov.Bar R. I(8)(A). Such conduct strikes at the very core of a lawyer's relationship with the court and with the client. Respect for our profession is diminished with every deceitful act of a lawyer.

(Ellipsis sic.) *Fowerbaugh* at 190.

{¶ 47} In accordance with our caselaw, Jarvis's dishonest conduct merits an actual suspension. However, we have stated that an exception to this rule may be justified when "an abundance of mitigating evidence" is shown. *Disciplinary Counsel v. Markijohn,* 99 Ohio St.3d 489, 2003-Ohio-4129, 794 N.E.2d 24, ¶ 8, citing *Dayton Bar Assn. v. Kinney*, 89 Ohio St.3d 77, 728 N.E.2d 1052 (2000).

{¶ 48} In mitigation, the majority finds that "Jarvis ha[d] no prior discipline, made full and free disclosure to the board and exhibited a cooperative attitude toward the disciplinary proceedings, and had other penalties or sanctions imposed by virtue of the malpractice action and its anticipated damage award." Majority opinion, ¶ 31. The majority concludes that these mitigating factors "are sufficient to rebut the presumption that Jarvis's dishonest requires an actual suspension from the practice of law." *Id.* at ¶ 40. I disagree.

{¶ 49} While these mitigating factors are worthy of consideration, they are not enough to overcome the numerous instances of dishonesty that Jarvis committed during his representation of Frank and Lenor. Our caselaw supports this conclusion.

{¶ 50} In *Disciplinary Counsel v. Shaffer*, 98 Ohio St.3d 342, 2003-Ohio-1008, 785 N.E.2d 429, a client retained John S. Shaffer to handle the sale of the client's grandmother's real estate. The grandmother had been incapacitated by a

stroke for over a year. Shaffer instructed his client to forge his grandmother's name on a backdated power of attorney. Shaffer then "fraudulently authenticate[d] the signature by signing as a witness, notarizing it, and backdating the jurat." *Id.* at ¶ 6. Shaffer also instructed his secretary to witness the forged signature. Finally, Shaffer assisted with the closing on the property, including representing that the title was marketable.

**{¶ 51}** The court found it mitigating that Shaffer had no prior disciplinary record, did not profit from his actions, accepted responsibility for his misconduct, had a cooperative attitude toward the disciplinary process, and made efforts to rectify the consequences of the misconduct.

**{¶ 52}** The court concluded that these mitigating factors were not sufficient to justify a fully stayed suspension. It reasoned:

> Respondent's misconduct manifests a course of conduct because he planned and administered a multistep process to defraud. Respondent may have genuinely hoped to serve his client by helping him avoid the expense of establishing a guardianship; however, he nevertheless perpetrated fraud on the court system and public by sidestepping safeguards in place to protect sellers and buyers of real estate.

*Id.* at ¶ 13. Therefore, in accordance with the general rule calling for an actual suspension, the court suspended Shaffer from the practice of law for one year with six months stayed on conditions.

**{¶ 53}** In *Karris*, 129 Ohio St.3d 499, 2011-Ohio-4243, 954 N.E.2d 118, Tom John Karris improperly notarized a woman's signature on four financial and real-estate documents when the woman's husband had actually signed the woman's name.

16

**{¶ 54}** In determining the appropriate sanction, the court found as aggravating factors that Karris had engaged in a pattern of misconduct involving multiple offenses, failed to make complete restitution, and refused to acknowledge the wrongful nature of his conduct. The court found as mitigating factors that Karris did not have a prior disciplinary record and had submitted evidence of his good character.

**{¶ 55}** On that record, the court "decline[d] to depart from the general rule that offenses involving dishonesty, fraud, deceit, or misrepresentation require an actual suspension from the practice of law." *Id.* at ¶ 19. Karris was suspended from the practice of law for six months, with none of the time stayed.

**{¶ 56}** Also instructive are cases in which the court disciplined attorneys for dishonest and deceitful conduct in their relationships with their clients. In *Disciplinary Counsel v. Keller*, 110 Ohio St.3d 240, 2006-Ohio-4354, 852 N.E.2d 1195, ¶ 3, Larry Wendall Keller was retained to pursue a personal-injury claim. Keller falsely informed the client that a complaint had been filed and that he was negotiating with the tortfeasor's insurance carrier. During the representation, he also falsely informed the client that he had received an offer to settle from the tortfeasor's insurer.

**{¶ 57}** The client eventually retained new counsel, who discovered that no lawsuit had been filed and that the two-year statute of limitations had run. The client sued Keller for malpractice and obtained a default judgment against him in the amount of $102,800, which Keller had not satisfied by the time that the decision issued.

**{¶ 58}** The court found in mitigation that Keller had no prior disciplinary record and that there was evidence of good character, chemical dependency, genuine remorse, and personal hardships, including the murder of the respondent's adopted daughter, the subsequent trial of her killer, and a difficult divorce, at the time of the misconduct.

**{¶ 59}** The court acknowledged Keller's mitigating evidence but found that his "attempts to conceal his neglect and his failure to remedy the harm that was caused warrant an actual suspension." *Id.* at ¶ 13. Keller was suspended from the practice of law for 2 years with 18 months stayed on conditions.

**{¶ 60}** In *Disciplinary Counsel v. Rooney,* 110 Ohio St.3d 349, 2006-Ohio-4576, 853 N.E.2d 663, John James Rooney misled a client about the status of a probate matter for two years. When the client learned of Rooney's deception, the client terminated the representation. Rooney promptly sent the client's file to the new attorney but did not refund the client's retainer until a year later.

**{¶ 61}** The court found the following mitigating factors: no prior disciplinary record, the absence of a dishonest or selfish motive, a timely and good-faith effort to rectify the consequences of the misconduct, full and free disclosure to the board and a cooperative attitude toward the disciplinary process, and evidence of good character. In rejecting a stayed suspension, however, the court stated that the mitigating factors "do not warrant a departure from the ordinary rule that an actual suspension should be imposed for dishonest conduct, particularly when that conduct is designed to 'mislead a court or client.' " *Id.* at ¶ 13, quoting *Akron Bar Assn. v. Holder*, 102 Ohio St.3d 307, 2004-Ohio-2835, 810 N.E.2d 426, ¶ 43. The court imposed a six-month actual suspension.

**{¶ 62}** In *Columbus Bar Assn. v. Roseman*, 147 Ohio St.3d 317, 2016-Ohio-5085, 65 N.E.3d 713, Darwin Richard Roseman neglected a client's personal-injury case, which resulted in the client being barred from litigating his claim in court. During the representation, Roseman was untruthful and deceitful in his communications with his client regarding why the client's case, which Roseman had dismissed without informing his client that he had done so, had not been refiled. The client later sued Roseman for malpractice and obtained a judgment for $135,000.

**{¶ 63}** The court found as mitigating factors that Roseman had no prior discipline and had cooperated in the disciplinary proceedings. The court concluded that a one-year suspension from the practice of law, with six months stayed on conditions, was appropriate for Roseman's dishonest behavior toward his client.

**{¶ 64}** The foregoing cases reveal that Jarvis's mitigating evidence, while favorable, does not overcome his repeated acts of dishonest conduct. Here, we are not faced with a single act of misconduct by improperly notarizing one or two documents. Rather, like in *Karris,* 129 Ohio St.3d 499, 2011-Ohio-4243, 954 N.E.2d 118, and *Shaffer*, 98 Ohio St.3d 342, 2003-Ohio-1008, 785 N.E.2d 429, Jarvis committed multiple acts of misconduct, including three separate occasions involving eight documents. And while Jarvis did not counsel his client to forge a signature, as Shaffer did, it is equally troubling that Jarvis falsely notarized and witnessed Frank's signature when he did not see Frank sign the documents and failed to ensure that Frank had the testamentary or contractual capacity to sign them. Jarvis's actions "perpetrated fraud on the * * * public by sidestepping safeguards in place to protect" the estate-planning process. *Shaffer* at ¶ 13.

**{¶ 65}** I recognize the favorable mitigating factors that are present here, but I cannot conclude that they are significant enough to warrant an exception to our general rule that dishonest conduct on the part of an attorney warrants an actual suspension from the practice of law. *See Karris* at ¶ 16. Therefore, I would suspend Jarvis from the practice of law for 18 months with one year stayed on the conditions that he commit no further misconduct and that he make restitution of $7,500 to Karen Balcar McGraw, as trustee of the Lenor W. Balcar Revocable Living Trust, within 30 days of the date of this court's order.

**{¶ 66}** Because the majority does not impose an actual suspension, I dissent.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Karen H. Osmond and Adam P. Bessler, Assistant Disciplinary Counsel, for relator.

Charles J. Kettlewell, L.L.C., and Charles J. Kettlewell, for respondent.

_____